**Jerry L. SHINABERRY, Plaintiff,**

v.

**COMMISSIONER OF SOCIAL SE-CURITY ADMINISTRATION, Defendant.**

**Civil Action No. 1:07CV28.**

United States District Court, N.D. West Virginia.

March 7, 2008.

---

Judith C. Walz, Lewisburg, WV, for Plaintiff.

Helen Campbell Altmeyer, U.S. Attorney's Office, Wheeling, WV, for Defendant.

### ORDER ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

IRENE M. KEELEY, District Judge.

Pursuant to 28 U.S.C. § 636(b)(1)(B), Rule 72(b), Federal Rules of Civil Procedure and Local Court Rule 4.01(d), on March 5, 2007, the Court referred this Social Security action to United States Magistrate John S. Kaull with directions to submit proposed findings of fact and a recommendation for disposition. On January 3, 2008, Magistrate Kaull filed his Report and Recommendation ("R & R") which also directed the parties, in accordance with 28 U.S.C. § 636(b)(1) and Rule 6(e), Fed.R.Civ.P., to file any written objections with the Clerk of Court within ten (10) days after being served with a copy of the R & R. On January 23, 2008, counsel

for the plaintiff, filed objections to the R & R. On January 24, 2008, the Commissioner of Social Security ("Commissioner") filed a response to the plaintiff's objections.

## I. *PROCEDURAL BACKGROUND*

On June 3, 2003, Jerry L. Shinaberry ("Shinaberry") protectively filed an application for Disability Insurance Benefits ("DIB") alleging disability due to shortness of breath, chest pain, and lower back and leg pain. The Commissioner denied Shinaberry's applications at the initial and reconsideration levels. On August 9, 2005, an Administrative Law Judge ("ALJ") conducted a hearing at which Shinaberry, represented by counsel, testified. A Vocational Expert ("VE") and Vicki Shinaberry, plaintiff's wife, also testified. On December 19, 2005, the ALJ determined that Shinaberry retained the residual functional capacity to perform sedentary work.

On January 31, 2006, Shinaberry filed a Request for Review of Hearing Decision with the Appeals Council. The Appeals Council denied Shinaberry's request for review, making the ALJ's decision the final decision of the Commissioner. On March 5, 2007, Shinaberry filed this action seeking review of the final decision.

## II. *PLAINTIFF'S BACKGROUND*

Shinaberry was 43 years old when he stopped working, 46 years old when he filed his application, and 49 years old at the time of the administrative hearing. He has an eleventh grade education and past relevant work as a coal mine machine operator

## III. *ADMINISTRATIVE FINDINGS*

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), the ALJ found that Shinaberry:

1. met the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(I) of the Social Security Act and was insured for benefits through the date of the decision;

2. had not engaged in substantial gainful activity since the alleged onset of disability;

3. had pneumoconiosis and degenerative disc disease of the lumbosacral spine that are considered "severe" based on the requirements in the Regulations at 20 CFR § 404.1520(c) but do not meet or medically equal the requirements of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

4. was not totally credible in his allegations regarding his limitations;

5. retained the residual functional capacity for work at the sedentary exertional level that may require standing for at least two hours out of eight with limited pushing/pulling in the lower extremities; no climbing of ladders, ropes or scaffolds; no stooping or crouching; no more than occasional climbing of stairs/ramps, balancing, kneeling, or crawling; must avoid concentrated exposure to temperature extremes, moderate exposure to hazards, wetness and humidity, and all exposure to fumes, odors, dusts, gases or poor ventilation;

6. was unable to perform any of his past relevant work (20 CFR § 404.1565);

7. was considered a "younger individual" (20 CFR § 404.1563);

8. had "a limited education" (20 CFR § 404.1564);

9. had no transferable skills from any past relevant work (20 CFR § 404.1568);

10. had the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567) but has exertional limitations that do not allow him to perform the full range of sedentary work. However, using Medical–Vocational Rule 201.19 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform, such as work as an assembler, a surveillance monitor, and a general office clerk; and

11. was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)).

## IV. PLAINTIFF'S OBJECTIONS

In his objections to the report and recommendation, Shinaberry alleges that the Magistrate Judge erred in accepting the ALJ's:

1. credibility assessment and contends that the Magistrate erred in deciding that the argument "is simply comparing apples and oranges, that is claimant's back impairment and his lung impairment;"

2. determination that he did not meet the criteria of Listing 3.02 C–3, Table III, A; and

3. determination that Shinaberry could perform work as a general office clerk or surveillance system monitor even though the Magistrate Judge determined that the vocational expert's findings were not totally consistent with the ALJ's hypothetical.

In his response to Shinaberry's objections, counsel for the Commissioner states that, because Shinaberry's objections are the same issues as those contained in his summary judgment brief, he is merely arguing that the Magistrate Judge erred when he adopted the ALJ's findings rejecting his original arguments.

## V. MEDICAL EVIDENCE

1. An April 19, 2000 office note from John D. Sharp, Ph.D., D.O., indicating complaints of back pain radiating to the hips and tailbone and that the injury to his back occurred either by pulling a cable at work or by lifting a motor at home. Dr. Sharp prescribed Vioxx and referred him to Dr. Douglas;

2. An April 21, 2000 lumbar spine MRI report indicating degenerative disc disease "particularly effecting [sic] lower 2 or 3 lumbar vertebral levels as well as T12–L1 and L1–2" and "no evidence for spinal canal stenosis or nerve root impingement though there is neural foraminal encroachment—effacement inferiorly at the level of L–4–5 particularly on the left but also present on the right;"

3. An April 21, 2000 lumbar spine x-ray report indicating "arthritic degenerative change with hyperostotic spurring" and "some narrowing at L5–S1" and "Dextroscoliosis in the thorcolumbar area;"

4. An April 25, 2000 office note from Dr. Sharp indicating that Shinaberry stated he "would like to file for workers' compensation as his back injury [was] related to work" and that Shinaberry's superintendent at the mine would "let [him] go back to light duty." Dr. Sharp continued the Vioxx and began processing the paperwork for a worker's compensation claim;

5. An April 28, 2000 report from Richard E. Ashley, Safety Director at Spruce Fork Mine No. 1, Shinaberry's employer indicating:

On or about April 15, 2000, Jerry Shinaberry, Continuous Miner Operator, Spruce Fork Mine # 1, came into the bath house walking with difficulty before the start of his shift. I asked Jerry what was wrong, had he gotten hurt the

night before? Jerry replied "I was lifting a Subaru engine and hurt my back." Jerry then said if his back did not improve soon, that he was going to the doctor.

Jerry started off work on April 19, 2000. On April 27, 2000, Larry Jones, superintendent of [the mine] and Jerry came into my office. Jerry gave me a WV Workers Compensation Report of Occupational Injury. Larry asked Jerry why he was now claiming on the job injury, when Jerry had told both of us previously, that he had injured his back lifting a Subaru engine. Jerry replied that his Dr. told him the lumbar sacral strain in his back and his herniated lumbar disc came from handling the miner cable all the time.

The report further indicated that Shinaberry represented that, when a co-worker asked him if he was going on compensation, he replied "I have to do something, I am going to lose my house." The report also indicated that Shinaberry's statement to Ashley, as documented by Ashley, was:

About 4–11–00 at about 10:00 PM my back started hurting while pulling miner cable. My back had been hurting since early in the year. I started going to Dr. Sharp in January and have been going about every (3) months since January.

6. A May 9, 2000 report from Richard A. Douglas, M.D., F.A.C.S., indicating complaints of low back pain and bilateral gluteal pain, right greater than left, and no leg pain or paresthesias or weakness of the legs. Shinaberry stated that he "presumed" he pulled a muscle on April 11, 2000 at work when he "pull[ed] a cable into the miner" and that, when he went home, he did additional lifting.

Examination revealed no cyanosis, clubbing, or edema of the extremities, minimal lumbar paravertebral spasm, negative straight leg raising test at ninety degrees, negative internal and external rotation of femurs bilaterally, motor strength of 5/5 in all major muscle groups, intact sensory examination, and normal cerebellar examination. After reviewing the April 21, 2000 lumbosacral spine MRI, Dr. Douglas determined that it revealed degenerative disc disease of the lumbar spine, with no disc herniation, fracture or spinal stenosis. Dr. Douglas recommended a referral to physical therapy for modalities and aquatic therapy, referral to pain management for possible trigger point injections, a total body bone scan due to history of radiation following an orchidectomy for testicular cancer, a return to clinic as needed, and no neurosurgical intervention at that time;

7. May 22, 24, 26, and 30, 2000, and June 1, 5, 8, and 13, 2000 office notes from Dr. Sharp indicating treatment with a TENS unit, osteopathic manipulative technique ["OMT"], and ultrasound therapy;

8. A June 16, 2000 office note from Dr. Sharp indicating treatment with a TENS unit, OMT and ultrasound therapy for back pain. Shinaberry stated that he could not bend his neck and he could not stand for long periods. Dr. Sharp prescribed Vioxx, Lorcet, and Xanax;

9. June 20, 27, and 29, 2000, and July 6, 11, and 13, 2000 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

10. A July 18, 2000 office note from Dr. Sharp indicating continued back pain and a report from Shinaberry that the regular pain medication "[did] something" to alleviate it. Shinaberry also reported that his buttocks were numb, he could not sit and that mowing the grass exacerbated his pain. Dr. Sharp prescribed Lorcet, Vioxx and Xanax;

11. July 25 and 27, 2000, and August 3 and 8, 2000, office notes from Dr. Sharp

indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

12. An August 17, 2000 office note from Dr. Sharp indicating a complaint of "bad days" due to pain. Dr. Sharp prescribed Lorcet and Xanax and provided samples of Vioxx;

13. An August 29, 2000 office note from Dr. Sharp indicating a complaint of severe back pain due to working on a truck. Dr. Sharp provided treatment with a TENS unit, hot packs, OMT and ultrasound therapy on this date, and also on August 31 and September 7, 2000;

14. A September 13, 2000 office note from Dr. Sharp indicating "popping" in his [Shinaberry's] back and that the pain was getting lower and worse, that he woke every two to three hours due to pain, and that he was "trying to walk some" but could not walk up hills. Dr. Sharp prescribed Lorcet and Vioxx and continued treatment with TENS unit, hot packs, OMT and ultrasound therapy;

15. November 2, 7, 14, 16, 28, and 30, 2000, and December 5, 7, 12, and 14, 2000 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy as well as prescriptions for Xanax and Lorcet;

16. A November 7, 2000 letter from Dr. Sharp to Richard Cardos, Shinaberry's attorney, regarding Shinaberry's worker's compensation claim indicating:

As I said before, (I think) that Jerry Shinaberry has pulled his low back lifting on a motor but he did continue to work. He then injured his back pulling a cable etc. in the coal mines. The "straw that broke the camels back" was the incident in the coal mine, which should be a compensable injury. I hope this can be cleared soon so that Mr. Shinaberry will be able to receive the proper appropriate medical care to repair his back in order for him to return to work as a productive citizen;

17. December 21, 2000, and January 2 and 4, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

18. A January 5, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy. Examination revealed clear lungs to auscultation and negative straight leg raising at seventy degrees on the left and eighty-five degrees on the right. Shinaberry reported he had "slip[ped] a little on ice," and twisted his back. He further reported that he was "getting depressed waiting on" workers' compensation to decide his claim;

19. January 9, 11, 16, 18, and 30, 2001, February 1, 6, 8, 13, 15, 20, 22, and 27, 2001, and March 1, 2, 8, and 13, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy for continuing complaints of low back pain and pain in hips and legs;

20. A March 14, 2001 office note from Dr. Sharp indicating complaints of being "stiff all over" and having severe pain in low back and hips. Examination revealed reduced range of motion and reduced neck abduction/adduction. Dr. Sharp diagnosed chronic low back pain and provided treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

21. April 10 and 13, 2001 office notes from Dr. Sharp indicting treatment with a TENS unit, hot packs, OMT and ultrasound therapy, as well as complaints of inability to sleep, depression and numbness and pain radiating to legs and knees;

22. A May 1, 2001 report from a bone scan indicating "minor degenerative change", "[n]o evidence of metastatic deposit," and "no minor degenerative type activity over the major joints;"

23. A May 7, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy, a review of the May 1, 2001 bone scan, which Dr. Sharp considered to be normal, and complaints from Shinaberry that he was "overall getting worse" because he could not bend forward and that the trip to Lewisburg, West Virginia "killed" him. Dr. Sharp referred Shinaberry to a Charleston, West Virginia pain clinic, and noted that he was considering physical therapy treatment;

24. A May 14, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy. Shinaberry reported he was "fair", had been "trying to turkey hunt" and had been walking;

25. May 17 and 22, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy, as well as a prescription on May 22, 2001 for Lorcet and Xanax;

26. May 24 and 30, 2001, and June 5, 12, and 17, 2001 office notes from Dr. Sharp indicating treatment with TENS unit, hot packs, OMT and ultrasound therapy;

27. A June 19, 2001 office note from Dr. Sharp indicating complaints of sleeplessness due to pain, inability to lift more than ten to fifteen pounds, and continuous pain radiating down both legs. Examination revealed negative straight leg raising test at sixty degrees on right and seventy degrees on the left. Dr. Sharp noted that Shinaberry was waiting for approval from workers' compensation for treatment at the pain clinic;

28. June 21, 26, and 28, 2001, and July 3, and 5, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

29. A July 9, 2001, office note from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy for his back pain, as well as complaints of inability to bend or pick up anything, inability to sleep, continual pain and pain radiating to his back and to his right hip;

30. A July 16, 2001 letter from Dr. Sharp to West Virginia Workers' Compensation Division noting that he had been treating Shinaberry since April 19, 2000 for low back pain, that Shinaberry had been temporarily and totally disabled since the injury on April 19, 2000, and seeking authorization for a referral to Raymond Harron, M.D., a neurosurgeon in Roanoke, Virginia, and referral for a MRI;

31. July 17, 19, 24, and 31, 2001 office notes from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

32. An early September, 2001 office note from Dr. Sharp indicating complaints of pain and numbness in the right leg, inability to sleep, attempts to walk and prescriptions for Vioxx, Lorcet and Xanax;

33. A September 13, 2001 neurosurgical consultation report from A. E. Landis, M.D., who reviewed various medical records and then performed an IME. Dr. Landis' examination revealed:

> 45 year old male of Japanese ancestry stands 5 ft 7 in. tall, weighs 182 lbs. He is well developed, well nourished, healthy, alert, in no distress. He moves well without any restriction. He does not limp. He is able to undress and dress without any assistance. He is able to get on and off the exam room table without any difficulty. Range of motion assessment results in flexion 30 degrees; extension 15 degrees; right and left side bending 20 degrees in each direction. He complains of central localized low back pain on all ranges of motions without any radicular component. There is no evidence of any spasm of

the paravertebral muscles. There is no deformity of the lumbar spine. There is no localized tenderness. Heel and toe walking are done without difficulty. Straight leg raising in the sitting position at 180 degrees of knee extension; 90 degrees of hip flexion causes low back pain bilaterally without sciatic radiation. Straight leg raising in the supine position to 45 degrees bilaterally causes low back pain without sciatic radiation. Neurological examination reveals no motor weakness or muscle atrophy in any major muscle group in either lower extremity. The thighs measure 51 cms in the mid thigh region bilaterally at comparable levels. The calves measure 39 cms, in the mid calf region bilaterally at comparable levels. Sensory examination is intact throughout both lower extremities except for decreased sensation over the anterior lateral right thigh which he describes as a tingling sensation only in the distribution of the anterior lateral femoral cutaneous nerve. Deep tendon reflexes reveal the knee jerks to be 2 + and equal. The ankle jerks are likewise 2+ and equal. Reflexes are brisk and symmetrical.

X–RAYS: Lumbosacral spine series with outside films in AP and lateral projection with obliques and spot lateral view taken here in the clinic show degenerative lipping at L1–L2, as well as at L4 on the AP view without any scoliosis. The lateral view shows diffuse degenerative lipping throughout the lumbar spine with minimal narrowing at the L5–S1 level. The oblique views taken today show diffuse degenerative osteophytic lipping at the superior aspect of most levels. There are also degenerative changes in the facet joints at 15–S1. The pars interarticularis are intact at all levels.

Review of his MRI Scan taken previously shows minimal degenerative disc

DISCUSSION: It is my impression that Mr. Shinaberry sustained a strain/sprain type of injury to his lower back as a result of the work related incident noted above. The injury was superimposed on some pre-existing degenerative changes which may have been aggravated by the injury. He has undergone extensive treatment with electrical stimulation, ultrasound and osteopathic manipulation without any appreciable benefit. However, his treatment has not been altered to any great extent over the course of the last year and a half. At this point, I feel that the claimant would probably benefit from aggressive stretching exercise program for his back under the supervision of a qualified physical therapist. His Vioxx should be re instated 25 mgs. to 50 mgs. a day. It is my opinion that he should be taken off the Lorcet 10/650 and placed on a milder analgesic, such as Ultram. Possibly even Tylenol would benefit him along with the Vioxx. I find no evidence of any radiculopathy at this time. It is not likely that any injection therapy is going to be of any benefit to him. Another factor that has to be considered is the closing of his mine last summer and the fact that he does not have a job to return to. If he is going to be referred to a pain management clinic, then he should be referred to a multi-disciplinary program, such as Oasis Program, though maybe one closer to his home. I would suggest re-evaluation to determine his impairment in another 4 to 6 months, at which point he should have reached maximum degree of medical improvement;

34. An October 3, 2001 office note from Dr. Sharp indicating treatment with a

TENS unit, hot pack, OMT and ultrasound therapy;

35. An October 9, 2001 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy due worsening back pain, numbness from his hip to his knee, and pain in his groin area;

36. An October 25, 2001 office note from Dr. Sharp indicating that Shinaberry stated that Vioxx upset his stomach, that he had pain in his groin area and that it was difficult for him to stand;

37. An October 26, 2001, office note from Dr. Sharp indicating inability to sleep. Dr. Sharp recommended that Shinaberry begin physical therapy and he refilled Shinaberry's prescriptions for Vioxx and Lorcet;

38. A January 8, 2002 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

39. A January 16, 2002, office note from Dr. Sharp indicating complaints of moderate to severe pain and soreness in his spine, episodes of entire back hurting, inability to bend to pick up anything and difficulty putting on his shoes. Shinaberry stated that he believed physical therapy had made his condition worse. Examination revealed negative straight leg raising test at sixty degrees on the right and eighty-five degrees on the left. Dr. Sharp prescribed a home TENS unit and Vioxx;

40. A March 18, 2002 lumbar spine x-ray report indicating minor disc space narrowing at T12–L1 and L1–2, mild marginal spurring, no fracture or focal bony destruction, no subluxation and an impression of "mild degenerative change";

41. A March 18, 2002 lumbar spine MRI report indicating "mild degenerative disc disease and tiny central disc protrusions noted at T12–L1 and L1–2" and "no

other significant abnormalities ... and ... no demonstrable metastatic disease;"

42. A May 8, 2002 letter from Raymond V. Harron, D.O. indicating "no real significant change in his [most recent MRI] study in comparison from the [MRI] study of 2000," and noting "some degenerative changes up at the T12–L1 and L1–L2 region [and] L4–L5 level." His examination was essentially normal and Dr. Harron recommended a myelogram and post-myelographic CT scan of the lumbar spine and lower thoracic spine for further evaluation;

43. A June 3, 2002 lumbar myelogram CT scan report indicating:

At L2–3 there is no disc bulge or foraminal stenosis. Minimal discogenic spurring is seen anteriorly;

At L3–4 there is no significant disc bulge or foraminal stenosis;

At L4–5 there is minimal broad based bulge without associated mass effect or nerve impingement;

At L5–S1 there is minimal central disc protrusion without associated mass effect;

44. A June 10, 2002 letter from Dr. Landis to Workers' Compensation indicating Shinaberry was in no distress, moved without restriction, did not limp, could dress and undress and get on and down from the examination table without difficulty. Examination revealed range of motion was forward flexion forty degrees, extension fifteen degrees, right side bending twenty degrees, left side bending twenty-five degrees, with complaints of pain and no radiation, no spasm, could heel and toe walk without difficulty, had some tenderness to palpation at L5–S1, sitting straight leg raising test was 180 degrees, supine straight leg raising test was forty-five degrees due to pain without radiation,

and had no motor weakness in the lower extremities.

Dr. Landis further indicated:

DISCUSSION: It is my impression that Mr. Shinaberry sustained a simple strain/sprain type of injury to his lower back region in the work related incident noted above. The injury was superimposed on some mild degenerative changes with MRI Scan showing degenerative disk changes at L4–L5 and L5–S1 but no evidence of disc herniation. He has had neurosurgical evaluations by Dr. Crowe and Dr. Harron, neither of whom found any evidence of radiculopathy or localizing neurological findings. Recent myelogram/post myelogram CT Scan again showed mild degenerative bulging without disc herniation at any level. He is now over two years post injury. He has had appropriate extensive, adequate, conservative treatment without any benefit. He obviously has reached maximum degree of medical improvement from this soft tissue strain/sprain injury. He does not require any additional treatment, though he should be allowed to continue conservative treatment with followup with his family physician every three months to obtain his medications. The only thing I would suggest is that he be tried on another nonsteroidal anti-inflammatory medication that does not cause any GI symptoms. He is no longer temporarily totally disabled and certainly capable of performing at least light to sedentary type work. Based on the *A.M.A. Guides to Impairment Rating* Fourth Edition, employing the Range of Motion Model, as required by the Office of Judges, the claimant's range of motion measurements do not pass the validity criteria, besides that, he restricts his range of motion due to pain. Therefore, it is not appropriate, according to the A.M.A. Guides to use range of motion measurements to assess impairment.

However, in order to satisfy the Office of Judges' requirements for use of this method, Table 75 is employed, placing him in Category II–B, which allows for a 5% whole-man impairment. DRE Method would also allow for 5% whole-man impairment, placing him in DRE Category II. The claimant's condition is not expected to be progressive. He does not require rehabilitation services;

45. A June 26, 2002 letter from Dr. Harron to Dr. Sharp indicating that he had reviewed the lumbar myelogram and post-myelographic CT scan and found mild disc bulging at L4–L5 and L5–S1, but no nerve root or spinal cord compression. Dr. Harron did not recommend any surgery and felt that he should be treated conservatively for his pain;

46. A July 2, 2002 office note from Dr. Sharp indicating tenderness at his L1–2 area, and a complaint from Shinaberry that he could not "do anything." Dr. Sharp provided treatment with a TENS unit, hot packs, OMT and ultrasound therapy;

47. A July 18, 2002 office note from Dr. Sharp indicating Shinaberry reported that "driving kill[ed]" him, and that he could not perform yard work or operate a chain saw;

48. An August 26, 2002 office note from Dr. Sharp indicating complaints of back, tailbone and groin pain and inability to sit after driving to Elkins and back home. Dr. Sharp provided treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

49. A September 17, 2002 office note from Dr. Sharp indicating complaints of pain down the back of his right leg to his ankle and spasms in his mid back. Treatment included a TENS unit, hot packs, OMT and ultrasound therapy. Dr. Sharp

provided Celebrex samples and prescribed Lorcet, Xanax and Zanaflex;

50. A September 18, 2002 office note from Dr. Sharp indicating complaints of continuing groin pain and back pain that radiated to his hips. Shinaberry stated he had a "knot on [right] side [of] back [at] S1" and had pain in his groin to his ankle when he tried to cut firewood. Examination revealed straight leg raising test was forty degrees on the right and sixty degrees on the left;

51. An October 16, 2002 report from Charles McClung, D. 0., McClung Health & Wellness Center, indicating review of lumbar myelogram which was negative for Foraminal increment. Dr. McClung noted that the MRI revealed bulging disks L1, 2, 4, 5 and T12. He diagnosed work-related lower thoracic and lumbar sprain with soft tissue injury and recommended treatment with ligament injections to the lower thoracic and lumbar spine every two weeks for a four-month period along with aggressive physical therapy and continued heat, ice and tinge [sic] unit;

52. An October 22, 2002 office note from Dr. Sharp indicating complaints of severe pain in his right leg, numbness, groin pain, severe muscle spasms in his right back, and inability to bend forward to pick up anything from the floor. Treatment included a TENS unit, hot pack, OMT and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax and Zanaflex;

53. An October 30, 2002 office note from Dr. Sharp indicating continued complaints of back pain and that bending over the day before caused the pain to become "severe." Dr. Sharp diagnosed "low back chronic pain;"

54. A November 7, 2002 office note from Dr. Sharp indicating treatment with a TENS unit, hot packs, OMT and ultrasound therapy. Shinaberry reported that the Vioxx was not "helping" relieve his pain;

55. A November 18, 2002 office note from Dr. Sharp indicating Shinaberry reported that his low back pain continued, that rehabilitation therapy was making his condition worse, that he was not sleeping, that his right leg was numb, and that he still had pain in his groin. He received treatment with a TENS unit, a hot pack, OMT and ultrasound therapy;

56. A December 4, 2002 office note from Dr. McClung indicating that Shinaberry had received a ligament injection and reported that he had suffered back spasms on the left side and had had no relief of his pain;

57. A December 10, 2002, office note from Dr. Sharp indicating that Shinaberry's back pain was worse and that he had muscle spasms. He was treated with a TENS unit, hot pack, OMT and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax and Vioxx;

58. A December 19, 2002 office note from Dr. McClung indicating that Shinaberry received another injection;

59. A January 8, 2003 office note from Dr. McClung indicating that Shinaberry had stated the previous injection had "helped for 1 to 1½ days" and that he experienced lower back pain on both sides of his spine. Shinaberry received another injection;

60. January 9, 16, and 23, 2003 office notes from Dr. Sharp indicating Shinaberry had complained of continued back pain and had received treatment with a TENS unit, a hot pack, OMT and ultrasound therapy;

61. A January 22, 2003 office note from Dr. McClung indicating that Shinaberry reported he "felt good [for] 3 days past injections." Shinaberry received another ligament injection;

62. A January 27, 2003 office note from Dr. Sharp indicating Shinaberry's pain was

"bad again," his "back muscles [were] hard as knots," and he was "ok" if he did not do anything, but "down 3 days" if he did. Dr. Sharp recommended that Shinaberry participate in physical therapy and work hardening. Treatment included a TENS unit, hot pack, OMT and ultrasound therapy and prescriptions for Zanaflex, Xanax and Vioxx;

63. A February 12, 2003 office note from Dr. McClung indicating Shinaberry reported that his previous injection caused "a lot [sic] of pain & muscle spasms [for] 2 weeks" and that he had been doing better until he trimmed trees. Shinaberry received ligament injections on February 12, 2003 and March 5, 2003;

64. A March 14, 2003 chest x-ray indicting "interstitial fibrosis with progressive mass of fibrosises [sic] highly consistent with a coal worker's pneumoconiosis";

65. A March 14, 2003 pulmonary function test indicating "mild restriction", a predicted FVC of 4.58 liters and an actual reading of 3.36 (73.44% of predicted), 3.22 (70.33% of predicted) and 3.18 (69.40% of predicted), a predicted FEV–1 of 3.74 liters and actual readings were 2.56 (68.58% of predicted), 2.67 (71.41% of predicted), and 2.63 (70.51 of predicted);

66. A March 19, 2003 office note from Dr. McClung indicating Shinaberry had experienced increased pain due to driving his car for two hours. Dr. McClung noted reduced swelling of the low back muscle. Shinaberry reported that the previous injection provided pain relief for two days. He received another ligament injection;

67. A March 25, 2003 office note from Dr. Sharp indicating Shinaberry complained of continued back pain, numbness down the right leg to his knee and muscle spasm in his thoracic spine. Shinaberry reported that a "knot came out on [his] spine" and "went away [by his] using heat & ice";

68. A March 28, 2003 office note from Dr. McClung indicating Shinaberry reported "a lot" of relief on the left side from his previous injection but had an "episode" on the right side with bad numbness;

69. A March 31, 2003 office note from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, a hot pack, OMT and ultrasound therapy and prescribed Lorcet, Vioxx and Xanax. Shinaberry reported the ligament injections were "helping some";

70. An April 7, 2003 office note from Dr. McClung indicating Shinaberry had received an epidural lumbar injection and that Shinaberry had reported that the last injection provided relief for seven days and had helped relieve the spasms. Shinaberry also reported he "tried to run power saw;"

71. An April 8, 2003 office note from Dr. Sharp indicating Shinaberry had complained of continued back pain, chest pain, and shortness of breath;

72. An April 10, 2003 office note from Dr. Sharp indicating treatment with a TENS unit, a hot pack, OMT and ultrasound therapy. Based on his review of Shinaberry's chest x-ray, Dr. Sharp noted that there may be a mass in the right upper lobe and referred Shinaberry to a pulmonologist. Dr. Sharp noted that Shinaberry's EKG was normal;

73. Office notes for April 15 and 16, 2003 from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, a hot pack, OMT and ultrasound therapy;

74. An April 16, 2003 office note from Dr. Sharp indicating that he completed a Physician's Report of Occupational Pneumoconiosis for West Virginia Workers' Compensation Fund. The report noted that he had begun treating and examining Shinaberry for pneumoconiosis on March 14, 2003, that Shinaberry had never had pneu-

monia, pleurisy, asthma, tuberculosis, angina pectoris, coronary occlusion, rheumatic heart disease, congestive heart failure, or arthritis, that Shinaberry's current complaints were dry cough for five years, shortness of breath (worse with exertion) for five years, wheezing (with exertion) for five years, and orthopnea. Dr. Sharp indicated that Shinaberry had coarse breath sounds, had chest pain and shortness of breath that increased with normal exercise, and that Shinaberry's "SOB and sweats had increased over the past year";

75. An April 17, 2003 "Routine Abstract Form—Physical" of Shinaberry from Jaroslaw Pondo, M.D. indicating normal gait, station, fine motor ability, gross motor ability, joints, muscle bulk, ranges of motion, reflexes, sensory deficits, motor strength, coordination, and mental status, cardiovascular examination, dyspnea, with exertion, orthopnea, cyanosis, and edema, digestive system, and abnormal breath sounds. Dr. Pondo's assessment was pneumoconiosis;

76. An April 17, 2003 chest CT scan indicating "pneumoconiosis, denser and more massive on the right";

77. An April 21, 2003 Vocational Progress Report from the State Division of Rehabilitation Services indicating:

Right now Jerry is very concerned about the nature and the extent of his lung problem and treatment options, which undoubtably will affect his return to work potential. He has shortness of breath with minimal exertion. He is equally limited by his pulmonary and his musculoskeletal conditions. A return to work in the coal mines is looking less and less likely. He has earned very good wages and lacks the education and skills to obtain more sedentary and undoubtedly more technical and clerical types of work that would provide commensurate wages. In addition, he lives in a very rural area where employment options are very limited and he does not want to relocate. Improvement in physical functioning and improvement in academic achievement are critical to successful return to work.

The report further noted a plan for Shinaberry's continued treatment with Dr. McClung to decrease pain and muscle spasm, and that upon completion of the treatment a functional capacity evaluation would be performed to define his abilities and limitations and compare them with the physical requirements of his pre-injury job. Shinaberry was to continue with GED classes and participate in vocational training through DRA to identify his aptitudes and abilities should a job change or a change in vocation be necessary;

78. An April 22, 2003 "short stay record" from Davis Memorial Hospital indicating a diagnosis of pneumoconiosis;

79. An April 22, 2003 x-ray report from Davis Memorial Hospital indicating no pneumothorax and no pneumomediastinum. Shinaberry also had a right upper lobe lung washing that revealed no malignancy. The biopsy of his right upper lobe of his lung showed "bronchial mucosa with fibrosis, chronic inflammation, and deposition of both polarizable and non-polarizable foreign material consistent with anthracosis and silicosis;"

80. An April 23, 2003 office note from Dr. Sharp indicating complaints of continued chronic back pain, numbness in his arm, and treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

81. An April 30, 2003 office note from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy for reported pain between his shoulders to his neck and shortness of breath with exertion. Dr. Sharp prescribed Lorcet, Vioxx, Xanax and Zanaflex;

82. May 5, 14, 23, and June 2, 2003 office notes of Dr. McClung indicating complaints of significant pain and receipt of ligament injections;

83. A May 6, 2003, office note from Dr. Sharp indicating that, after Dr. McClung performed manipulation therapy on May 5, Shinaberry "felt something catch in [his] back." Dr. Sharp provided treatment with a TENS unit, hot pack and ultrasound therapy;

84. A May 9, 2003 procedure report from a bronchoscopy performed by Dr. Pondo indicating a diagnosis of pneumoconiosis and silicosis. Examination revealed supple neck and chest clear to auscultation, no clubbing, cyanosis, or edema in his extremities and that Shinaberry was neurologically intact;

85. A May 15, 2003 office note from Dr. Sharp indicating that Shinaberry had received a ligament injection to his spine on May 14, 2003 and had reported that it was "helping" his back pain, treatment with a TENS unit, hot pack, OMT and ultrasound therapy, and a referral to TriState Occupational Rehabilitation;

86. A May 22, 2003 office note from Dr. Sharp indicting that Shinaberry reported his low back pain continued but that the ligament injections were "helping", and treatment with TENS unit, hot pack, OMT and ultrasound therapy;

87. A May 27, 2003 office from Dr. Sharp indicating treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

88. A June 3, 2003 office note from Dr. Sharp indicating a ligament injection on June 2, 2003. Shinaberry reported that he had developed neck pain about one and one-half months ago, had received manipulation therapy from Dr. McClung, but reported pain between his shoulders and into his neck that caused severe headaches. He stated his neck "grind[ed] and pop[ped]" and was "tight." Dr. Sharp prescribed Toradol, Lorcet, Medrol DosePak and Percocet;

89. A June 11, 2003 office note from Dr. McClung indicating Shinaberry had reported neck pain, stating that his last injection "helped" for three days. Shinaberry received another injection;

90. A June 12, 2003 office note from Dr. Sharp indicating Shinaberry continued to have neck pain and headaches. Sharp instructed him to treat his symptoms with a home TENS unit and scheduled an appointment with TriState Occupational Rehabilitation for June 20, 2003;

91. A June 24, 2003 office note from Dr. Sharp indicating Shinaberry complained of constant low back pain and neck pain, inability to change a flat tire by himself, and that he had received treatment with a TENS unit, hot pack, OMT and ultrasound therapy;

92. A July 1, 2003 office note from Dr. Sharp indicating Shinaberry had increased cervical pain, had received treatment with a TENS unit and hot pack to the neck, and had been prescribed Lorcet, Vioxx and Xanax;

93. A July 9, 2003 office note from Dr. McClung indicating that Shinaberry did not want additional injections to his neck because they caused soreness, that his previous ligament injection provided relief from back pain for fourteen days, and that he received a lumbar injection;

94. A July 11, 2003 office note from Dr. Pondo indicating that Shinaberry did not have "any shortness of breath more than usual", experienced "on and off" chest pain and no hemoptysis. Examination revealed that his chest was clear to auscultation, his heart rate was regular, he had no clubbing, cyanosis, or edema, his neurological examination was intact, and a diagnosis of pneumoconiosis/silicosis;

95. A July 18, 2003 office note from Dr. McClung indicating that Shinaberry's previous injection had "helped for a few days," but Shinaberry had experienced neck, low back, and groin pain. He administered a ligament injection to Shinaberry;

96. A July 21, 2003 office note from Dr. Sharp indicating that Shinaberry reported falling on a concrete floor and injuring his neck. Dr. Sharp provided treatment with a TENS unit, hot pack, OMT and ultrasound therapy, prescribed Percocet and referred Shinaberry to a pain clinic in Charleston, West Virginia;

97. A July 23, 2003 office note from Dr. Sharp indicating Shinaberry had received treatment with a TENS unit, hot pack, OMT and ultrasound therapy and a prescription for Toradol;

98. A July 24, 2003 pulmonary function study report from Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board indicating that the test was performed while resting and only with pre-bronchodilator due to heart disease, that the spirometry ranged from fifty-three to eighty-five percent of predicted value, that diffusion ranged from sixty and eighty-nine percent of predicted value;

99. A July 28, 2003 office note from Dr. McClung indicating that Shinaberry's injections were "helping the back some" and that he had administered another injection to Shinaberry;

100. A July 31, 2003 office note from Pocahontas Medical Clinic indicating Shinaberry had complained of cough, chest congestion, sinus drainage, and temperature and had received prescriptions for Levaquin, Atrovent, Albuterol and Advair;

101. An August 5, 2003 office note from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, hot pack and ultrasound therapy, and had completed a Routine Abstract Form Physical for the Disability Determination Section of the State of West Virginia. On the form, Dr. Sharp noted a diagnosis of COPD, Black Lung disease, lumbosacral strain, lumbar disc disease and "c-strain", respiration of sixteen and walking with a limp, abnormal vision, normal hearing and speech, normal joints, abnormal gait and station due to limp, abnormal fine motor ability, abnormal gross motor ability, abnormal ranges of motion both left and right, and abnormal right lower extremity's muscle bulk, abnormal right lower extremity reflexes, abnormal sensory deficits, abnormal motor strength, abnormal coordination, abnormal frequency of seizures and/or blackouts, and abnormal mental status due to depression, normal respiratory functions of cyanosis and edema, abnormal breath sounds, orthopnea, and dyspnea (with exertion and at rest), normal heart sounds, extremities, and circulation, no evidence of congestive heart failure and normal digestive system. Dr. Sharp also noted Shinaberry experienced chest pain due to his lungs, pneumonia and chronic cough.

Dr. Sharp further indicated that Shinaberry received injections from Dr. McClung, that he had been examined for Black Lung disease, that he experienced chronic pain in his lumbar spine, and that he had right sciatic neuralgia, right leg numbness and headaches. Dr. Sharp determined Shinaberry was unable to bend, lift, sit or ride for over twenty to thirty minutes, was "unable to engage in any physical exercise" was "functionally limited" in "physical exercise and sitting", and was able to drive only 30–40 minutes with rest;

102. An August 13, 2003 office note from Dr. Sharp indicating he had treated Shinaberry with a TENS unit, hot pack, OMT and ultrasound therapy;

103. An August 18, 2003 office note from Dr. Sharp indicating Shinaberry continued to receive ligament injections and

that Shinaberry stated these had "help[ed]" his low back pain but he had continued pain in his neck, pain in his right side, and numbness in his fourth and fifth right digits and had a tender cervical spine;

104. An August 25, 2003 office note from Dr. McClung indicating Shinaberry had "improved mobility" in his "L/S spine" and that Shinaberry had reported that the last injection had "done good;"

105. An August 26, 2003 office note from Dr. Sharp indicating Shinaberry reported that the ligament injection on August 25, 2003 caused his back to feel "better". Dr. Sharp prescribed Lorcet, Vioxx and Xanax;

106. A September 4, 2003 office note from Dr. Sharp indicating complaints of continued back pain, a tender lumbar spine, loss of lordosis, loss of range of motion, painful range of motion, painful flexion, extension and lateral rotation. He treated Shinaberry with a TENS unit, hot pack, OMT and ultrasound therapy and prescribed Lorcet, Vioxx and Xanax;

107. A September 10, 2003 Physical Residual Functional Capacity Assessment indicating Shinaberry could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, had unlimited ability to push/pull, was frequently limited in his ability to climb, balance, stoop, kneel, crouch, and crawl, had no manipulative, visual, or communicative limitations, had no limitations regarding exposure to extreme cold and heat, wetness, humidity, noise, vibration, and hazards, and should avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation;

108. September 11 and 16, 2003 office notes from Dr. Sharp indicating Shinaber-ry had been treated with a TENS unit, hot packs and ultrasound therapy;

109. A September 24, 2003 letter from Dr. Sharp to the West Virginia Workers' Compensation Division seeking approval for payment for pulmonology evaluations, a chest CT scan, endobronchial scoping, a PET scan, and prescriptions for Singulair and Albuterol based on recent x-rays showing increased densities in his lungs when compared to the 1998 x-rays. Dr. Sharp noted Singulair and Albuterol "help[ed] [Shinaberry] to breath more easily;"

110. October 2, 10, and 16, 2003 office notes from Dr. Sharp indicating he had treated Shinaberry with a TENS unit and hot pack, and had prescribed Lorcet, Vioxx, Xanax and Zanaflex;

111. October 9, 20, and 29, 2003 office notes from Dr. McClung indicating that Shinaberry reported ligament injections had helped his pain and/or spasms;

112. An October 16, 2003 letter from Dr. Sharp to the West Virginia's Workers' Compensation Division requesting authorization for treatment due to an acute lower respiratory infection. Dr. Sharp noted that the x-ray revealed Shinaberry had pneumonia, not mycloplasm, of his left lung, was positive for rales and rhonchi and had been treated with injections of Claforan, DepoMedrol, and Vitamin B12 and had been provided samples of Avelox;

113. An October 21, 2003 office note from Dr. Sharp indicating his treatment of Shinaberry with a TENS unit, hot pack, OMT and ultrasound therapy;

114. An October 23, 2003 PET scan report indicating "findings most consistent with pneumoconiosis/silicosis" and "no evidence for extra thoracic abnormal uptake;"

115. An October 30, 2003 office note from Dr. Sharp indicating complaints by Shinaberry of continued back pain, numb-

ness in his right leg to his knee "all the time". Dr. Sharp treated Shinaberry with a TENS unit and a hot pack and pre-scribed Lorcet, Vioxx and Xanax;

116. A November 8, 2003 office note from Dr. McClung indicating that Shina-berry reported his sciatic nerve was much better, but he still experienced back pain. Shinaberry received an injection;

117. A November 10, 2003 office note from Dr. Pondo indicating that Shinaber-ry's PET scan was "positive in the lungs, [m]asses no extra thoracic uptake," which was consistent with inflammation. He di-agnosed pneumoconiosis and prescribed Prednisone;

118. A November 11, 2003 letter from James E. Bland, M.D., to Workers' Com-pensation Fund indicating that "the four frequency totals of 100 in the right ear and 105 in the left ear would obtain a 0% wholeman impairment award. One per-cent would be indicated for any speech discrimination deficits, making a total bi-lateral wholeman impairment award of 1.0%;"

119. A November 12, 2003 office note from Dr. Sharp indicating Shinaberry re-ported continued back, neck and shoulder pain and had received treatment with a TENS unit, hot pack and ultrasound thera-py. Shinaberry reported he had received an injection from Dr. McClung that did not "help numbness & pain . . .;"

120. November 19 and 25, 2003 and December 3, 2003 office notes from Dr. Sharp indicating treatment with TENS unit, hot pack, OMT and ultrasound thera-py and prescriptions on December 3, 2003, for Vioxx, Xanax and Lorcet;

121. A November 20, 2003 office note from Dr. McClung indicating Shinaberry reported some pain in his groin and some swelling in his lower back after the last injection and that all of sciatic nerve pain was gone. Shinaberry received another injection;

122. A December 3, 2003 letter from Dr. Sharp to the West Virginia Workers' Compensation Division, requesting approv-al for Singulair and Albuterol based on Shinaberry's continued shortness of breath and occasional lung pain. Dr. Sharp noted that both of these medications "help[ed] to ease [his] discomfort and enable[d] him to breathe easier;"

123. A December 8, 2003 office note from Dr. McClung indicating Shinaberry had received a ligament injection;

124. A December 11, 2003 office note from Dr. Pondo noting the same results as the November 10, 2003 examination and a diagnosis of "pneumoconiosis/massive" and progressive fibrosis. Dr. Pondo ordered a CT scan to evaluate Shinaberry's response to the Prednisone;

125. A December 19, 2003 chest CT scan indicating an impression of bilateral upper lobe mass compatible with progres-sive massive fibrosis that was relatively stable in appearance over the past eight months, a slight decrease in inflammation of the perihilar regions, as compared with a prior study and no changes suggestive of malignancy;

126. A January 15, 2004 progress note from Dr. Pondo indicating findings of neck supple, chest clear to auscultation, extrem-ities without clubbing, cyanosis, edema, neurologically non focal, and a diagnosis of pneumoconiosis and massive fibrosis;

127. A January 29, 2004 treadmill stress test indicating that Shinaberry had been tested at two miles per hour and had achieved his target heart rate, tolerated the test well, without complications, and had post-test readings of pH 7.38; pCO2 36; pO2 57; HCO3 20, B.E. –3.6, and O2 Sat. 89;

128. A January 29, 2004 pulmonary function study at Chest Medical Services indicating that Shinaberry's pre-drug spirometry scores ranged from sixty-five to ninety-eight percent of predicted value;

129. A February 11, 2004 letter from Dr. Sharp to the West Virginia Workers' Compensation Division requesting authorization for treatment for bronchitis and pneumonia due to coughing, shortness of breath and congestion, reduced breath sounds in his lungs, and a chest x-ray that "revealed an infiltrate in the left lower and mid base." Dr. Sharp reported he had treated Shinaberry with Claforan, Depo-Medrol, and Vitamin B12 and prescribed Avelox. Dr. Sharp referred Shinaberry to Dr. Pondo for further evaluation;

130. A February 16, 2004 office note from Dr. Pondo indicating a diagnosis of pneumoconiosis with his chest positive for wheezes;

131. A February 16, 2004 Neuropsychological Screening Profile from Sharon Joseph, Ph.D., indicating that Shinaberry reported a back injury, Black Lung disease, a neck injury, migraine headaches and memory loss. He listed his prescriptions as Albuterol, Singulair, Ipratropium Bromide, Vioxx, Tizanidine, Alprazolam, Lorcet and Percocet, stated he did not use tobacco and drank alcohol rarely, and had never been treated for an emotional or psychological problem. He informed Dr. Joseph that he was being treated by Dr. Brick, a neurologist.

Examination revealed Verbal IQ of 75, Performance IQ of 80, and Full Scale IQ of 75 and a determination of Borderline Range of Intellectual Functioning. Shinaberry was alert and oriented times three, reported difficulty sleeping, mild depression, poor appetite, denied suicidal or homicidal ideations, hallucinations, delusions, preoccupations, obsessions, or compulsions, displayed no "obvious physical limitations relative to dexterity, ambulation, or speech", had calm motor activity, had appropriate posture, average eye contact and language, and normal speed of speaking, had normal, immediate and remote memory, mildly impaired recent memory, moderately impaired judgment and mildly impaired concentration.

Activities of daily living included: awaking at 9:00 a.m., drinking coffee, watching television, eating dinner, retiring at 11:00 p.m., attempting to go outside in the afternoons depending on the weather, making his bed, dusting, cooking a meal, putting away groceries, taking out the garbage, walking to the mailbox, going grocery shopping, driving a car, and managing his finances. He stated he could remember to turn off the stove, was unable to go up and down stairs well, could "fish a little" and enjoyed playing cards. Diagnostic impression was Axis I—adjustment disorder with depressed mood; Axis II—Borderline Intellectual Functioning; and Axis III—back injury, neck injury, Black Lung, history of testicular cancer, migraine headaches (all per Shinaberry's report). Dr. Joseph determined that his psychological prognosis was fair and he could manage benefits, and his socialization was within normal limits;

132. A February 18, 2004 letter from Dr. Sharp to the West Virginia Workers' Compensation Division requesting authorization for Lorcet, Vioxx, Zanaflex and Xanax, and indicating that Shinaberry reported his pain was "9/10 without pain medication, and 4/10 with pain medication." Dr. Sharp recommended a pain management consultation to determine if any treatment should be taken to relieve the pain and chronic muscle spasms;

133. A February 18, 2004 letter from Dr. Sharp to the West Virginia Workers' Compensation requesting approval for Singulair Albuterol and Zithromax due to a continued cough. Dr. Sharp also noted that Dr. Gaziano had recommended an

evaluation for a "mass/density that was seen in his lungs;"

134. A March 15, 2004 progress report from Dr. Pondo indicating no cough or fever, supple neck, chest clear to auscultation, stable respiratory system, and noting that Dr. Pondo would observe Shinaberry "off r/x;"

135. A June 2, 2004, Physical Residual Functional Capacity Assessment indicating Shinaberry could occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for six hours in an eight hour work day, sit for a total of six hours in an eight hour workday, had unlimited push/pull ability, was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl, had no manipulative, visual or communicative limitations, unlimited in his exposure to extreme cold and heat, wetness, humidity, noise, and vibration, and should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards. The state agency physician reduced Shinaberry's residual functional capacity ("RFC") to light work;

136. A June 4, 2004 Psychiatric Review Technique from Rosemary K. Smith, Ph. D., indicating an organic mental disorder (borderline functioning), affective disorder (adjustment disorder), mild limitation in his activities of daily living, moderate restriction in ability to maintain social functioning, mild limitation in ability to maintain concentration, persistence, and pace, and no episodes of decompensation. She determined that Shinaberry did not meet the "C" criteria of the Listings;

137. A June 4, 2004 Mental Residual Functional Capacity Assessment from Dr. Smith indicating moderate limitation in ability to understand and remember detailed instructions; moderate limitation in ability to carry out detailed instructions; moderate limitation in ability to interact appropriately with the general public; and

no significant limitation in ability to remember locations and work-like procedures, ability to remember and understand very short and simple instructions, ability to carry out very short and simple instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance and be punctual, ability to sustain an ordinary routine without special supervision, ability to work in coordination with or proximity to others without being distracted by them, ability to make simple work-related decisions, ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ability to ask simple questions, request assistance, accept instruction, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or being distracted by them, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness, ability to respond appropriately to changes in the work setting, be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, or make plans independently of others. Dr. Smith determined Shinaberry would be "able to learn and perform simple, unskilled worklike activities;"

138. A June 9, 2004 independent medial evaluation ("IME") of Shinaberry from Joseph J. Renn, III, M.D., F.C.C.P., performed on May 19, 2004, which revealed no acute distress. Shinaberry's cardiac exam showed no trills, gallops or murmurs, his lungs were clear to palpation, percussion, and auscultation, he had no jugular venous distention, hepatojugular reflux, hepatomegaly, cyanosis, clubbing, or edema. He had a normal electrocardiograph and his chest radiograph showed category "C"

complicated pneumoconiosis with no other abnormalities. He had a normal spirometry, lung volumes, and resting arterial blood gases, and moderately reduced diffusing capacity that partially corrected toward normal when the alveolar volume was considered. Dr. Renn diagnosed "simple coalworkers' pneumoconiosis", "complicated coalworkers' pneumoconiosis" and "moderate diffusion abnormality" and determined that Shinaberry should not return to any type of "work where he [would be] exposed to coal mine dust owing to the presence of complicated coalworkers' pneumoconiosis" and that he was "totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis." Dr. Renn also determined that Shinaberry was incapable of performing heavy manual labor for extended periods of time due to his exercise-induced hypoxemia;

139. An August 23, 2004 award of benefits from the United States Department of Labor under the Black Lung Act for pneumoconiosis;

140. An October 14, 2004 resting pulmonary function study from the Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board indicating that the exercise component of this test was not administered due to back pain, a spirometry score ranging from 73% to 95% of the predicted value, pre-bronchodilator, and 79% to 95% of the predicted value, post-bronchodilator, a diffusion score ranging from 56% to 80% of the predicted value, pre-bronchodilator, and 57% to 85% of the predicted value, post-bronchodilator;

141. A December 1, 2004 award of 65% disability from the West Virginia Workers' Compensation Commission due to occupational pneumoconiosis;

142. A January 25, 2005 letter from Dr. Sharp to Shinaberry's attorney indicting that Shinaberry could not walk three hundred feet on a level surface at a slow pace and, were he to carry ten pounds, his distance would be reduced to one hundred and fifty to two hundred feet, could walk fifty feet uphill, and, were he to carry ten pounds or a gun, he could walk only fifteen to twenty feet without resting, could not fly-fish due to neck and right arm pain, but might be able to "sit by the lake with a cane pole" and fish, was unable to perform all of his activities of daily living and his parental obligations, and was "unable to sit and drive over 15 miles without changing positions and stopping." Dr. Sharp determined "[t]here [was] no unskilled sedentary type work, ... any where [sic] within an hours [sic] drive of his home" and he "doubt[ed] that [Shinaberry] [was] capable of maintaining any type of unskilled, sedentary job;"

143. A January 25, 2005 Medical Assessment of Ability to do Work–Related Activities (Physical) from Dr. Sharp indicating Shinaberry's ability to lift or carry was affected by his impairment because he could not bend, lift or squat, could lift ten to twenty pounds for "5 minutes max", was unable to carry, his COPD affected his ability to stand or walk, had "very limited lung capacity," and pneumoconiosis, could walk ten minutes without interruption and for less than thirty minutes total, could sit ten minutes without interruption and for a total of two hours per day, could never climb, balance, stoop, and crouch, could occasionally kneel, crawl, and push/pull, was limited in reaching in all directions and gross manipulation with his right arm and hand, but had no other manipulative limitations, had visual limitations without glasses, but no visual limitations when he wore his glasses, and environmental restrictions included heights, moving machinery, temperature extremes, chemicals, and dust;

144. A January 27, 2005 report from Mohamed Fahim, M.D. of the Pain Management Clinic at Davis Memorial Hospital, indicating that Shinaberry had reported difficulty sleeping, as well as back pain, headaches, left leg weakness and depression. Examination revealed no thyromegaly, regular cardiovascular rate and rhythm, clear lungs to auscultation, bilaterally, soft and tender abdomen, no edema in extremities, steady and normal gait, ability to walk on tiptoes and heels, intact cranial nerves, intact and normal motor power in upper and lower extremities, bilaterally, intact and normal sensations in the upper and lower extremities, intact reflexes, decreased range of motion in his neck, tenderness over the cervical facet joints, bilaterally, straight leg testing was fifty degrees, bilaterally, positive Patrick's test, bilaterally, tenderness over both the lumbar facet joints on both sides, and tenderness over both sacroiliac joints. Dr. Fahim noted that Shinaberry's response "to the examination was exaggerated."

Dr. Fahim reviewed several diagnostic tests and offered the following opinions:

- April 21, 2001, MRI of lumbar spine showed degenerative disc disease, particularly affecting lower two or three lumbar vertebral levels as well as T12–L1 and L1–2, neural foraminal encroachment, no evidence for spinal canal stenosis, no definite nerve root impingement, and effacement interiorly at L4–5, bilaterally;
- August 3, 2001, MRI of lumbar spine showed minimal diffuse disc bulge at L3–4, without significant mass effect, broad-based disc bulge at L4–5, with minimal bilateral recess stenosis, and evidence of artherosclerotic change in the aorta;
- October 26, 2001, dynamic motion x-ray of lumbar spine showed minimal osteoarthritis, narrowing of L1–L2 disc space, and restricted motion on lateral bending to right;
- March 18, 2002, MRI of lumbar spine showed mild degenerative disc disease and tiny central protrusions noted at T12–L1 and L1–2;
- March 18, 2002, plain x-ray of lumbar spine showed mild degenerative changes; and
- June 3, 2002, lumbar spine CT scan and lumbar myelogram CT showed mild diffuse disc bulge at L4–5 without significant mass effect and mild disc bulge at L5–S1 without significant mass effect.

Dr. Fahim diagnosed bilateral lumbar facet joint disease, bilateral sacroiliac joint disease, bilateral cervical facet joint disease, degenerative disc disease of the lumbar spine, myofascial pain syndrome of the upper and lower back, Black Lung disease, headaches, and multiple pain complaints, including lower back pain, neck pain, and bilateral lower extremity pain. He continued the medications prescribed by Dr. Sharp, referred Shinaberry to Dr. Sharon Joseph for a psychological evaluation, and scheduled left lumbar facet joint injections, right lumbar facet joint injections, left sacroiliac joint injections, right sacroiliac joint injections, right cervical facet joint injections, and left cervical facet joint injections. Dr. Fahim noted that, if Shinaberry's pain continued after the series of injections, he would consider lumbar epidural steroid injections;

145. A March 23, 2005 letter from Dr. Sharp to Shinaberry's attorney indicating that Shinaberry had been diagnosed with occupational pneumoconiosis with total pulmonary function impairment by the Occupational Pneumoconiosis Board, and that he had not completed the July 24, 2003 and October 14, 2004 exercise tolerance testing by the Occupational Pneumoconiosis Board because of heart disease during the first

exam and back pain during the second exam;

146. An April 21, 2005 letter from Dr. Sharp to Shinaberry's attorney indicating:

Jerry was injured on 04–11–00. He has been on pain medication Lorcet 10–650, Zanax, Zanaflex, Vioxx and/or Celebrex for four years. He has been referred to Dr. Fahim (Pain Management Clinic)(Report attached) who continued the medication and who is giving trigger injections. Rule 20 gives a time frame for narcotic mediation. However, Jerry has never been tapered from his medications or stopped his medications. His pain is chronic and progressive and does not fall under the guides of Rule 20 for treatment of acute and transient pain. WVWCC does not have a specific "RULE" for treating chronic, progressive pain with and/or without depression. They say refer to a pain management clinic. If pain management says continue medications, WVWCC pulls out Rule 20. If pain management puts in a morphine pump or spinal stimulator they pay for this and medications for "eternity". What is the difference in chronic pain relief treatment?

Rule 20 is obsolete and needs updated with up-to-date chronic pain management input;

147. A May 19, 2005 a consultative examination from Arturo Sabio, M.D., for the West Virginia Disability Determination Service indicating a review of the following medical records:

- March 19, 2002 lumbar MRI, which showed mild degenerative disc disease of the T12 and L1, L1 and L2 interspaces;
- June 3, 2002 lumbar myelogram, which showed minimal anterior epidural impression of the L3–L4 and L4–L5 interspaces;
- June 3, 2002 lumbar spine CT scan, which showed mild diffuse disc bulge at L4–5 and L5–1 interspace and no mass effect;
- December 19, 2003 chest CT scan, which showed bilateral upper lob mass compatible with progressive muscle fibrosis and no evidence of malignancy;
- Dr. Pondo's consultations notes, dated May 9 and July 11, 2003, diagnosing Plaintiff with pneumoconiosis;
- April 22, 2003 bronchoscopy results, which showed no interbronchial lesions, but inflammatory changes; and
- Results from the specimen from the bronchial washing and bronchial biopsy, which showed fibrosis, chronic inflammation, and foreign material consistent with anthracosis and silicosis.

Dr. Sabio's examination revealed:

- GENERAL APPEARANCE: Well-developed, well-nourished, alert and oriented to time, place and person. The patient ambulates with a normal gait, without ambulatory aids. The patient is stable at station. There is no lurching or unpredictability in gait. The patient is able to hear and understand conversational voices spoken at normal volume levels. Visual fields are normal by gross confrontation testing.
- VITAL SIGNS: In stocking feet, this 48–year old male is 5 feet, 5 inches tall and weighs 162 pounds. Blood pressure is 126/84, pulse rate 72 per minute and regular and respirations are 22 per minute and unlabored. Visual acuity is 20/30 on the right side and 20/30 on the left, without corrective lenses. The patient is right-handed. He refused a chaperone during the examination.
- HEENT: The head is normacephalic. the pupils are equal and round and reactive to light and accommodation. The extraocular movements are intact.

The sclerae are nonicteric. The fundi showed no diabetic or hypertensive retinopathic changes. The tympanic membranes are normal; the nares are patent without discharge. the oropharynx is normal. No intraoral lesions found.

- NECK: The neck is supple. There is no stiffness, no thyromegaly, no lymphadenopathy, or masses palpable. The carotids are 2/2 without bruits. There is no jugular venous distension.

- CARDIOVASCULAR: Cardiovascular examination reveals a regular heart rate and rhythm, without murmurs, gallops or rubs. There are normal S1 and S2 heart sounds. The point of maximal impulse is in the fifth intercoastal space, left midclavicular line.

- CHEST: The chest is symmetrical. There is no increased AP diameter of the chest. The patient had rhonchi all over. He had frequent sighing breaths. He had a frequent dry cough. He did not have rales and there was no wheezing appreciated. The patient did not have cyanosis.

- EXTREMITIES: Palpation of the shoulders, elbows, wrists, and hands showed no tenderness, redness, effusion, swelling, hear, or any other signs of acute inflammation. There are no Heberden nodes, Bouchard nodes, or rheumatoid nodules found. Palpation of the hips, knees, and ankles showed no tenderness, redness, effusion, or signs of acute inflammation.

  The femoral pulses are 2/2 and symmetrical, without bruits. The dorsalis pedis and posterior tibial arteries have strong and symmetrical pulses. The capiliary refill is normal.

  Muscle development is symmetrical on both sides in the upper and lower extremities. No venous insufficiency, no varicose veins, and no stasis ulcers are found. There is no clubbing or cyanosis.

- SPINE: There is tenderness over the second and third thoracic vertebrae, tenderness over the lumbar 2nd, 3rd and L5–S1 vertebrae. The patient did not have kyphosis or scoliosis.

- RANGE OF MOTION: The cervical spine allows 60 degrees of flexion, 75 degrees of extension, lateral flexion is 45 degrees bilaterally, and rotation is 80 degrees bilaterally. Shoulder abduction is 180 degrees bilaterally; forward flexion is 180 degrees bilaterally; adduction [sic] is 50 degrees bilaterally; internal rotation is 40 degrees bilaterally and external rotation is 90 degrees bilaterally. Elbow flexion is 150 degrees bilaterally, extension is 0 degrees bilaterally, supination is 80 degrees bilaterally and pronation is 80 degrees bilaterally. Wrist dorsiflexion is 60 degrees bilaterally; palmar flexion is 70 degrees bilaterally; radial deviation is 20 degrees bilaterally and ulnar deviation is 30 degrees bilaterally. All the joints of the hands allow 90 degrees of flexion and 0 degrees of extension. The straight leg raising is 45 degrees bilaterally, restricted by pain in the lumbar spine. The lumbar flexion is only 30 degrees forward and 10 degrees laterally to either side, and he refused to go any further because of pain and stiffness in his back. The hips allow 100 degrees of flexion and 30 degrees of extension bilaterally. The knees allow 150 degrees of flexion and 0 degrees of extension bilaterally. The ankles allow 20 degrees of dorsiflexion and 40 degrees of plantar extension bilaterally.

- NEUROLOGICAL: The patient is alert and oriented to time, place and person. Cranial nerves II through XII were grossly normal. Sensory

function to light touch and pinprick is intact throughout. The motor strength is graded 5/5 in the bilateral upper extremities and 5/5 in the bilateral lower extremities.

The mid-arm circumference is 28 centimeters bilaterally. The mid-forearm circumference is 27 centimeters bilaterally. The mid-calf circumference is 38 centimeters bilaterally. The hand grips are measured at 35 KGF on the right and 36 KGF on the left. This is normal for this right-handed individual.

The deep tendon reflexes were normal. The Babinski reflex is negative bilaterally. The patient is able to walk on the heels, on the toes and heel-to-heel in tandem. He is able to stand on either leg separately. He is able to squat fully. Fine manipulation movements were normal.

. . .

• SUMMARY: This 48–year old male relates a history of shortness of breath of six years duration. He used to work for almost 20 years in the coal mine, and he has a chronic cough with frequent wheezing. On the examination, the patient was noted to have a[sic] asymmetrical chest. He had frequent sighing breaths, and he had frequent dry cough. The patient also had rhonchi all over. There was not wheezing. He did not have rales. He did not have edema. His sighing breaths were carefully masked after he was trying to take deep breaths because of hypoxemia. The patient did not have cyanosis.

He complains of low back pain since 2000. He hurt his back while he was pulling a miner cable. He has had numerous workups, and he was found to have degenerative disk disease and diffuse bulging of the disks at the L4–L5, L5–S1 level with no significant mass effect. On the examination, the patient was able to walk with a fluid gait. He did not have any hitches in this gait and there was no lurching or unpredictably [sic] of the gait. The patient did not require any ambulatory aids. There is tenderness over the spinous process of the T2 and T3 vertebrae and tenderness over the L2–L3 and L5–S1 vertebrae. There was no kyphosis or scoliosis. The patient had restriction of straight leg raising to 45 degrees bilaterally because of pain in the lumbar spine. The lumbar flexion was only 30 degrees forward and 10 degrees laterally to either side. He flatly refused to go any further because of the pain in the lumbar spine. The patient is able to talk on the heels, on the toes and heel-to-toe in tandem. He is able to stand on either leg separately. He is able to squat fully. Fine manipulation movements were normal. The patient had a normal neurological examination. There was no muscle atrophy or weakness. The patient has a history of testicular cancer, treated with orchidectomy. He did not have any recurrence of the cancer. There was no tenderness. There was no adenopathy noted in the inquinal areas or in the axillary and supraclavicular areas. The patient appears to be doing well from the previous orchidectomy and radiation;

148. A May 19, 2005 Medical Source Statement of Ability to do Work–Related Activities (Physical) from Dr. Sabio indicating ability to occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, stand or walk for at least two hours in an eight-hour workday, and limited pushing or pulling in his lower extremities, no opinion offered regarding ability to sit, no climbing, occasional crouch, crawl, and stoop and frequent balance and kneel, no manipulative, visual, or communicative

limitations, due to breathing problems, limited exposure to dust, fumes, odors, chemicals, and gases, but not to temperature extremes, vibrations, humidity, wetness and hazards;

149. A May 19, 2005 ventilatory function test from Tri–State Occupational Medicine indicating Shinaberry's effort was good and the pulmonary function study was normal;

150. A June 30, 2005 Physical Residual Functional Capacity Assessment from Dr. Sharp indicating ability to occasionally lift or carry ten pounds or less, frequently lift or carry ten pounds or less, stand or walk for at least two hours in an eight-hour workday, sit for a total of about six hours in an eight-hour work day with periodic alternate sitting and standing to relieve pain or discomfort, and push/pull was limited in his lower extremities, occasionally limited in his ability to climb ramps and stairs, balance, kneel, and crawl, could never climb ladders, ropes, scaffolds, stoop, or crouch, no manipulative or visual limitations, communicative limitation was noted as a one percent hearing loss, unlimited exposure to noise and vibrations, avoid concentrated exposure to extreme cold and heat, avoid moderate exposure to wetness, humidity or hazards, avoid all exposure to fumes, odors, dusts, gases, and poor ventilation.

Dr. Sharp noted Shinaberry had pneumoconiosis, which was progressive, that had caused a chronic cough and for which he would be under the constant care of a pulmonologist. Dr. Sharp also noted that Shinaberry had injuries to his lumbar, cervical and thoracic spine, which limited his physical abilities to lift, carry and bend. In Dr. Sharp's determination, "[h]is functional ability would be sedentary with limitations, under the optimal conditions. Not Pocahontas County;" and

151. A December 18, 2006, Office of Workers' Compensation Division of Coal Mine Workers' Compensation award of permanent, total disability due to "functional limitations imposed as a direct result of occupational pneumoconiosis."

## VI. DISCUSSION

### A. Standard of Review

In *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990), the Fourth Circuit held that, in reviewing an administrative finding of no disability, the Court is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." In *Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986), the Fourth Circuit held that "[o]ur scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence."

In *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)), the Supreme Court defined substantial evidence as "such relevant evidence as a reasonable mind might accept to support a conclusion." In Hays, the Fourth Circuit elaborated on this definition, stating that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" 907 F.2d at 1456 (*quoting Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir.1966)). In *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987), the Fourth Circuit held that a reviewing court must also consider whether the ALJ applied the proper standards of law. "A factual finding by the ALJ is not binding if it was reached by means of an improper

standard or misapplication of the law." *Id.*

## B. *Credibility Analysis*

■ Shinaberry objects to the report and recommendation and argues that the Magistrate Judge Kaull erred in accepting the weight the ALJ assigned to the report of Dr. Landis when making his credibility analysis.

In *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)), the Fourth Circuit held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." In *Craig v. Chater*, 76 F.3d 585 (4th Cir.1996), the Fourth Circuit developed a two-step process to determine whether a person is disabled by pain or other symptoms. *Craig* requires:

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers.* The regulation thus requires at the *threshold* a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129....

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and per-*sistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Id.* at 594.

Here, the ALJ determined that the diagnosis of coal worker's pneumoconiosis and degenerative disc disease of the lumbosacral spine satisfied the first step of the two-prong test in *Craig*. The ALJ then proceeded to the second step of the two-prong test to determine the intensity and persistence of the pain and its limitations, if any, on Shinaberry's ability to work.

Pursuant to 20 C.F.R. § 404.1529, the ALJ reviewed Shinaberry's statements about his pain and limitations, his medical history, medical signs and laboratory findings, objective medical evidence of pain, his daily activities, his specific descriptions of the pain, and the medical treatment taken to alleviate it. During his review, the ALJ noted that, in 2000, Shinaberry applied for compensation benefits as a result of an injury to his back, and further noted that Shinaberry originally had reported to his safety director at work that

he had injured his back at home while lifting a Subaru motor.

Later, however, Shinaberry told his treating physician, Dr. Sharp, that he had hurt his back either at work, pulling on a mine cable, or at home while lifting a motor. On April 19, 2000, Dr. Sharp examined Shinaberry due to increased low back pain and inability to bend over and, later, in a letter to Workers' Compensation, reported that Shinaberry told him he pulled his back lifting a motor, but continued to work, then injured his back pulling a cable in the coal mine. On May 9, 2000, Shinaberry told Dr. Douglas that "while pulling a cable at the mines, he began to notice minor low back pain, presumed he had pulled a muscle, finished work that day, went home and then did some additional lifting at home."

Even though, for Social Security purposes, it is not relevant exactly how Shinaberry injured his back, his inconsistent statements about how that injury occurred give rise to a credibility question. They also suggest a possible motive for an attempt to magnify the gravity of Shinaberry's limitations.

The record is clear that the ALJ reviewed all of the evidence of record prior to making his credibility determination. He reviewed Dr. McClung's report, and noted that Shinaberry remained active and that his pain relief ended after he did some tree trimming, drove a car for two hours, or performed other activities. He "tried to hunt" but "couldn't walk a mile." Dr. Landis found that Shinaberry's range of motion measurements did not pass the validity criteria, and that Shinaberry restricted his range of motion due to subjective pain. Dr. Fahim, the Medical Director of a pain management center, noted that Shinaberry's responses to the examination were exaggerated. Dr. Sabio noted that, during range of motion testing, Shi-naberry "flatly refused to go any further because of pain in the lumbar spine."

Shinaberry accurately notes that he was found to be totally and permanently impaired by the Office of Workers' Compensation, Division of Coal Mine Workers' Compensation. This determination, however, does not preclude him from all work because it was based solely on the diagnosis of pneumoconiosis and not on his back impairment or a combination of the two impairments. Moreover, after reviewing the opinion of Dr. Renn, the Magistrate Judge determined that Shinaberry was not totally disabled from all work. As noted earlier in this opinion, Dr. Renn's report from 2004 stated:

> [Plaintiff] should not return to any type of work *where he is exposed to coal mine dust* owing to the presence of complicated coalworkers' pneumoconiosis. He is totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis. . . . From the medical records, catalogued above, it is evident that he has exercise-induced hypoxemia. He would be unable to perform *heavy manual labor for extended periods of time.*

(Emphasis added). Dr. Renn also indicated that Shinaberry only used a nebulizer "as needed," and that he had last used it three days earlier and that he had fished and hunted. Dr. Renn further noted that Shinaberry had stopped woodworking, and that "[h]is usual activities are shopping with his wife, reading the newspaper, doing some yard work and watching television." According to Dr. Renn, Shinaberry had normal spirometry and lung volume, moderately reduced diffusing capacity partially corrected toward normal when alveolar volume was considered, and normal resting arterial blood gases for his age.

■ In *Kesling v. Secretary*, 491 F.Supp. 569 (N.D.W.V.1980), the Court held:

The medical evidence of record substantiates the presence of medically determinable physical ailments, but does not necessarily substantiate the degree of severity claimed thereby by Plaintiff. [ FN*]

FN* In this regard, the Court notes that Plaintiff has been awarded federal black lung benefits. The only medical evidence of record which would appear to substantiate entitlement to black lung benefits is the results of a single pulmonary function study which result in qualifying values for MVV and FEV1. The Court further recognizes that entitlement to black lung benefits does not necessarily establish total disability under title II of the social Security Act.

Social Security Ruling ("SSR") 06-3p provides:

Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency.

The Magistrate Judge determined that the ALJ did not "rely" solely on the opinion of Dr. Landis but, pursuant to 20 C.F.R. § 404.1527, had reviewed and considered all of the evidence of record. Regarding that review, 20 C.F.R. provides:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate *every* medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(I) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longi-

tudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

After examining Shinaberry, Dr. Landis, an orthopedic surgeon, noted that, despite complaints of back pain on all ranges of motion, Shinaberry was able to sit on the examining table with both legs straight out in front of him and bend forward without having a significant increase in back pain. In addition to his examination, and before stating his diagnosis of simple strain/sprain type injury to the lower back superimposed on some mild degenerative changes, Dr. Landis reviewed a great deal of objective medical evidence. Significantly, he noted that Shinaberry's range of motion measurements did not meet the validity criteria and felt that it was inappropriate to assess impairment using range of motion guidelines. Dr. Landis did allow Shinaberry a minor 5% wholeman impairment, but further determined that Shinaberry was not temporarily totally disabled and "certainly capable of per-

forming at least light to sedentary type work."

It is correct that Dr. Landis evaluated Shinaberry only for his back impairment, not his lung impairment. His opinion, however, is consistent with the evidence of record as a whole regarding Shinaberry's back impairment, and is substantially supported not only by the evidence of record but also by his own examination. Therefore, the Magistrate Judge did not err when he determined that the ALJ had properly given Dr. Landis' opinion greater weight.

The ALJ determined:

The claimant has two well-documented impairments: coal worker's pneumoconiosis and degenerative disc disease of the lumbosacral spine. Both of these impairments cause significant work-related functional limitations. But it seems that secondary gain in the form of workers' compensation (Exhibits 3D and 6D) has driven the claimant to magnify the gravity of his limitations. The evidence as a whole establishes that the severity of the claimant's impairments does not preclude all substantial gainful employment.

After careful review of all of the evidence, the Magistrate Judge determined that the record contained substantial evidence to support the ALJ's credibility determination and the Court agrees.

## C.  *Listing 3.02 C–3, Table III, A*

■ Shinaberry objects to the Magistrate Judge's report and recommendation and contends that the ALJ erred in determining that he failed to meet the criteria set forth in Listing 3.02(C)(3). The Commissioner contends that the ALJ was correct in concluding that the record did not contain substantial evidence to support a finding that Shinaberry's pulmonary im-

pairment met the requirements of Listing 3.02(C)(3).

Listing 3.02(C)provides:

C. Chronic impairment of gas exchange due to clinically documented pulmonary disease. With:

1. Single breath DLCO (see 3.00F1) less than 10.5 ml/min/mm Hg or less than 40 percent of the predicted normal value. (Predicted values must either be based on data obtained at the test site or published values from a laboratory using the same technique as the test site. The source of the predicted values should be reported. If they are not published, they should be submitted in the form of a table or nomogram); or

2. Arterial blood gas values of $PO_2$ and simultaneously determined $PCO_2$ measured while at rest (breathing room air, awake and sitting or standing) in a clinically stable condition on at least two occasions, three or more weeks apart within a 6–month period, equal to or less than the values specified in the applicable table III–A or III–B or III–C:

Table III–A
[Applicable at test sites less than 3,000 feet above sea level]

| Arterial $PCO_2$ (mm. Hg) and | Arterial $PO_2$ equal to or less than (mm. Hg) |
|---|---|
| 30 or below | 65 |
| 31 | 64 |
| 32 | 63 |
| 33 | 62 |
| 34 | 61 |
| 35 | 60 |
| 36 | 59 |
| 37 | 58 |
| 38 | 57 |
| 39 | 56 |
| 40 or above | 55 |

As the Magistrate Judge noted, the requirements of the listing at issue are very strict. Under "Methodology," the Regulations provide:

The individual should then perform exercise under steady state conditions, preferably on a treadmill, breathing room air, for a period of 4 to 6 minutes at a speed and grade providing an oxygen consumption of approximately 17.5 ml/kg/min (5 METS)..... If the claimant fails to complete 4 to 6 minutes of steady state exercise, the testing laboratory should comment on the reason and report the actual duration and levels of exercise performed. This comment is necessary to determine if the individuals' test performance was limited by lack of effort or other impairment (e.g., cardiac, peripheral vascular, musculoskeletal, neurological.).... The exercise report should contain representative ECG strips taken before, during and after exercise; resting and exercise and grade settings ...; and the duration of exercise.... The altitude of the test site, its normal range of blood gas values, and the barometric pressure on the test date must be noted.

As noted above, on January 29, 2004, Shinaberry had a treadmill stress test at *Charleston Area Medical Center.* The report notes that he was tested at two miles per hour and achieved his target heart rate and tolerated the test well, without complications. His post-test readings were pH 7.38, pCO2 36, pO2 57, HCO3 20, B.E. –3.6, and O2 Sat. 89.

Because the initial review of the study indicated that the numbers in the January 29, 2004 report appeared to meet Listing 3.02(C)(3), the ALJ requested that Dr. Gomez, a Disability Determination Service medical consultant physician, review the report to determine whether the readings

satisfied the criteria of Medical Listing 3.02C.

Dr. Gomez reviewed the January 29, 2004 report and determined that the Arterial Blood Gas readings of pCO2 33 and pO2 84 (resting) did not meet the listing, and further indicated that he was unable to determine whether the Arterial Blood Gas readings of pCO2 36 and pO2 57 (exercise) met the Listing "since report does not give for how long patient exercised." Dr. Gomez further indicated that the May 19, 2004 PFS and DLCO readings also did not meet the listing. Thus, Dr. Gomez found that the record did not contain any test results that met the criteria of a listing.

After reviewing all this, the Magistrate Judge concluded:

> The Disability Determination Service (DDS) determined that the claimant had no impairment or combination of impairments that meets, or is equivalent to, the criteria of any of the listed impairments described in Appendix 1 of the regulations at 20 CFR, part 404, Subpart P. This conclusion by the DDS's expert medical consultants is consistent with the evidence and is accorded substantial evidentiary weight under Social Security Rules 96–60. No treating or examining physician has mentioned findings identical, or equivalent in severity, to the criteria of any listed impairment. Dr. Gomez, the DDS consulting physician carefully considered the arterial blood gas study reference by claimant's counsel (Exhibits 22F and 20F) and he concluded that, due to an absence of information regarding the length of time that the claimant exercised during the test, he could not determine whether the requirements of Medical Listing 3.02C had been met. The undersigned is not in the position to presume, as claimant's counsel wishes, 'that exercise was done at less than five (5) METS.' (Exhibit

22F, p. 1) Dr. Gomez further considered a pulmonary function studies (PFS) test and DLCO readings and opined that neither met the requirements of the appropriate Medical Listing (Exhibit 20F). Accordingly, after having reviewed the records, the undersigned finds that the claimant has not had impairments that meet or equal the requirements of any section of Appendix 1.

The Magistrate Judge also noted that, pursuant to 20 C.F.R. § 416.927(f)(2)(I), the ALJ is not required to accept the December 18, 2006, Office of Workers' Compensation Division of Coal Mine Workers' award of permanent, total disability due to "functional limitations imposed as a direct result of occupational pneumoconiosis" because, as noted earlier, pursuant to 20 C.F.R. § 416.927(f)(2)(I), ALJs "are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists" and must only "consider findings of State agency medical and psychological consultant or other program physicians or psychologists as opinion evidence, except for the ultimate determination about whether you are disabled."

As discussed earlier, Social Security Ruling ("SSR") 06–3p provides that the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner and that, because other agencies may apply rules and standards that are different from Social Security's regulations when determining whether an individual is disabled, their relevance may be limited.

The record is clear that the ALJ considered and relied on all of the evidence of record in determining that Shinaberry was not totally disabled from all work. The evidence considered included:

1. A June 9, 2004, independent medical evaluation from Dr. Renn, stating that:

[Plaintiff] should not return to any type of work *where he is exposed to coal mine dust* owing to the presence of complicated coalworkers' pneumoconiosis. He is totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis. . . . From the medical records, catalogued above, it is evident that he has exercise-induced hypoxemia. He would be unable to perform *heavy manual labor for extended periods of time;*

and

2. A June 30, 2005, Physical Residual Functional Capacity Assessment from Dr. Sharp, Shinaberry's treating physician, indicating "[h]is [Shinaberry's] functional ability would be sedentary with limitations, 'under the optimal conditions.' Not Pocahontas County".

The Magistrate Judge correctly determined that the ALJ had reviewed all of the medical evidence of record prior to concluding that Shinaberry did not meet any listing, and that the ALJ was correct in his decision to have a Disability Determination Service medical consultant physician review the January 29, 2004 blood gas study. Therefore, the Court agrees with the Magistrate Judge's determination that the record contains substantial evidence to support the ALJ's decision that Shinaberry failed to meet the criteria of a listing.

### D. *Hypothetical to Vocational Expert*

■ Shinaberry contends that, even though the Magistrate Judge determined that the vocational expert's findings were not totally consistent with the ALJ's hypothetical, he erred in accepting the ALJ's determination that Shinaberry could perform work as a general office clerk or surveillance system monitor. The Commissioner contends that the ALJ properly relied upon the testimony of the vocational expert in determining that Shinaberry retained the residual functional capacity to perform a significant number of jobs in the national economy.

The ALJ asked the following hypothetical:

Q. Please assume you are dealing with an individual the same age as the claimant who has the same educational background and past work experience. Further assume that the claimant retains residual functional capacity for sedentary work, with the following additional limitations. Standing at least tow hours, push-pull limited in the lower extremities, no ladders, ropes, scaffolds, stooping, or crouching, occasional climbing stairs, ramps, balancing, kneeling and crawling, avoid all exposure to fumes, odors, dust, gases, and poor ventilation, avoid even moderate exposure to extreme cold or heat. I take that since I'm at the sedentary level, he could not perform his past work. Is that correct?

A. No, sir.

Q. Could this individual perform any other job that exists in the local, regional, or national economy?

A. Under the conditions that you have set forth, yes.

Q. Could you please identify the job, their census number?

A. Yes, sir. He could do various assembly kinds of jobs performed at the sedentary, unskilled level. There's some 48,000 of those within the national economy, some 1700 of those within the region with the two regions being West Virginia and Virginia. The census number on that is 896. He could also do the work of a surveillance system monitor position. There's some 13,000 of those in the national economy, just under 500 of those in the region, with the region being Virginia and West Virginia. The census number on that is 395. He could do the work of, of a general office clerk. There's some 86,000 of those jobs in the

national economy, some 2400 of those within the region. The census number on that is 582, 586. That's examples of work that he might do.

Q. Did you, did you describe them as how the [sic] describe them in the Dictionary of Occupational Terms?

A. Yes, sir.

Q. Now there are the additional requirement to avoid frequent background noise. Does that change anything?

A. Possibly in the assembly positions. There are, is other work going on that would probably be at a moderate level.

Q. Now if same hypothetical, if you add the additional requirement that the individual be able to lay down on occasion several times a day, would those jobs be still available?

A. No Sir.

Shinaberry's attorney then asked the VE:

Q. In regard to the job that you listed Mr. Pearis, first in regard to the assembly job, out of the 58,000 national, 1700 regionally, would any of those jobs involve work in environments that may have dust, fumes, or other odors?

A. Well they all would have dust, but there's a moderate amount of dust, fumes, odors as we sit now. Reaching to a level as to be, well I don't know what his tolerance level is.

Q. Would there be more than what would be in the room that we are in today?

A. More than likely yes?

Q. Can you separate out a number from the numbers that you've given that would eliminate those jobs that would have—

A. I could not do that.

Q. Are assembly jobs generally done on a production basis?

A. Under some circumstances they might be. Generally though it's they're either coming down a line and you work at the rate of the line. In other situations in which the material is brought to you, you work it from there. Now like sewing, now like jobs that are piece work.

Q. It does require, would require that individual to be at that line to complete the work process?

A. Certainly, certainly.

Q. So, if the individual had to leave to use any nebulizer for 20 minute treatments during the day, would that interfere with their ability to do that job?

A. Certainly.

Q. In regard to the job that you listed as surveillance system monitor and the 13,-000 in the national economy and 500 in the region, are any of those government jobs?

A. Surely.

Q. Okay and would you be able to separate out of a portion of those that are government jobs from the numbers that you gave us today?

A. No. I might add that for the most part those are considered to be government jobs, but I'm sure that they—I say I'm sure. My best guess would be that they're not and this is probably one of the most under reported chops [sic] that I think we see, every Wal–Mart, every K–Mart, every bank, every—

Q. Government jobs generally require civil service testing?

A. Some of them certainly would, yeah.

Q. Would some of those jobs require a high school education?

A. Not that I know of. Not that I'm aware of.

Q. [INAUDIBLE] the job that you listed as a general office clerk, with 86,000 in the national economy and 2400 in the region, what would be example of jobs [sic] duties that, that individual would have to perform?

A. Some times they have to prepare documents of one kind or another. Some-

times they put labels on mailings, that kind of thing.

Q. Would that individual have to, would it require the using of any type of office equipment? {INAUDIBLE] answering the telephone, using a computer?

A. Possibly, Not the computer, no, not generally. Copy machine maybe, sure.

Q. If an individual had the ability as set forth at exhibit 8F which is a full scale IQ of 75, a vocabulary in the fourth grade range, and math in the eighth grade range, comprehension in the fifth grade range, would that individual have moderate difficulties in social functioning, moderate difficulties in concentration and memory, if their judgment was moderately impaired, and they had moderate limitations in their ability to understand and remember detailed instructions would that individual be able to do that job as a general office clerk?

A. That's quite a mouthful. My head, I'm not sure if I can sort all of that quite as quickly as you gave it to me. These, let me just try and answer it this way. These are basically routine kind of low level jobs. Most of them require less than a sixth grade education. I'm not going to say they all do, but generally they're the routine, the repetitive, the easier kinds of jobs.

Q. But if the individual had moderate difficulties in maintaining concentration, and moderate difficulties in social functioning?

A. Okay, let me again. I get hung up on the word moderate. I'm not exactly sure what you mean. So let me try and say that if moderate means that they would have difficulty on the job, they would not be able to perform the essential functions of the job then they would not be able to do that.

Q. Okay. If an individual had, with right arm dominant and they were limited in reaching in odd direction with the right arm, the right dominant arm and they were also limited in handling with the right arm, would that individual be able to do any of the jobs that you've listed?

A. That individual would be limited in performing his job, but if that's what you're, again what you're saying and then it would certainly create some difficulty. And again if gets back to whether or not an individual can perform the essential elements of the job.

Q. Would this job require reaching?

A. The jobs do require, the jobs do require reaching, handling, fingering and most of them on a rather frequent basis.

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." In *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992), the Fourth Circuit held that the ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." In *Koonce v. Apfel*, 1999 WL 7864, 166 F.3d 1209 (4th Cir.1999), the Fourth Circuit held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. In *Lee v. Sullivan*, 945 F.2d 687 (4th Cir.1991), the Fourth Circuit noted that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record."

■ Pursuant to 20 C.F.R. §§ 404.1566(e), 416.966(e), an ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. In *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989), the Fourth Circuit held that

"[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." In *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (*citing Walker v. Bowen*, 876 F.2d 1097, 1100 (4th Cir.1989)), the Fourth Circuit held that, when "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment."

Moreover, in *Edwards v. Bowen*, 672 F.Supp. 230, 235 (E.D.N.C.1987), the court held that if the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response to the question is binding on the Commissioner. Thus, the reviewing court must consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993).

The Magistrate judge determined that the ALJ had propounded a hypothetical presenting all of Shinaberry's impairments that were substantially supported by the record. Shinaberry correctly noted that the VE had stated some of the assembler jobs could involve background noise. On November 11, 2003, James E. Bland, M.D., indicated that "the four frequency totals of 100 in the right ear and 105 in the left ear would obtain a 0% wholeman impairment award. One percent would be indicated for any speech discrimination deficits, making a total bilateral wholeman impairment award of 1.0%." Significantly, on June 30, 2005, Dr. Sharp completed a Physical Residual Functional Capacity Assessment that indicated a 1% hearing loss and further reflects that Shinaberry's exposure to noise and vibration could be unlimited. Based on this evidence of record, the Magistrate judge correctly determined that the jobs listed by the VE would not be rejected due to background noise.

Regarding Shinaberry's alleged mental limitations, Dr. Joseph determined that his full scale IQ was in the Borderline Range. However, she also indicated that Shinaberry's motor activity was calm, posture was appropriate, eye contact was average, language usage was average, speed of speaking was normal, content was relevant, conduct during the interview was cooperative, no psychomotor disturbances were noted, affect was flat, insight was adequate, immediate memory was normal, recent memory was mildly impaired, remote memory was normal, judgment was considered moderately impaired, concentration only mildly impaired, and socialization and interaction were considered normal. Daily activities reported by Shinaberry included making the bed, dusting, cooking meals, putting groceries away, taking out the garbage, walking to the mailbox, driving a car, going grocery shopping, and managing his own finances. He fished a little and liked to play cards. Furthermore, she determined that Shinaberry's psychological prognosis was fair, that he could manage benefits, and that his socialization was within normal limits.

As noted earlier, when questioned about the clerk jobs, the VE testified that these were "basically routine kinds of low level jobs. Most of them require less than a sixth grade education. I'm not going to say they all do, but generally they're the routine, the repetitive, the easier kinds of jobs that might require the use of a telephone or copy machine, but not a computer."

Shinaberry has provided no evidence that he is incapable of handling the simple, routine clerk jobs listed by the VE. Certainly, Dr. Sharon Joseph's evaluation of-

fers him no support in that regard. Thus, after reviewing the evidence in the record, the Magistrate Judge correctly determined that the record contained substantial evidence to support the ALJ's reliance on the VE's testimony regarding the simple, routine clerk jobs, 86,000 in the national economy and 2,400 in the regional economy.

Regarding the possibility of a surveillance system monitor job, Shinaberry contends that at least some of these are government jobs that might require civil service testing. Even though the VE was unable to separate the government surveillance system monitor jobs from the non-government surveillance system monitor jobs, he testified that, while he could not provide exact numbers, he believed most of the surveillance system monitor jobs were not government jobs. To support his position, the VE noted that every Wal-mart, K-mart and bank probably has surveillance system monitor positions, and further noted that even actual government jobs would not require a high school education, or, generally, even a civil service test.

The Magistrate Judge relied on the recent case of *Quesenberry v. Astrue,* 2007 WL 2965042 (W.D.Va.) (slip copy), to further support the VE's testimony. In *Quesenberry,* the VE testified that "although the DOT listed the job of surveillance system monitor as a government job, that information is not accurate today because many private companies now install surveillance systems." *Id.* at *5.[1] Additionally, in *Wilcox v. Barnhart,* 2004 WL 1733447 (D.N.H.2004)(not reported in F.Supp.2d), the court disagreed with the claimant's argument that the DOT identi-

fied surveillance system monitors as government service jobs, stating:

A more close examination, however, reveals that the DOT's industry designation shows 'in what industries the occupation was studied but does not mean that it may not be found in others.' *Dictionary of Occupational Titles,* XXI (4th ed., rev. Vol I 1991). Therefore, industry designations are to be regarded as indicative of industrial location, but not necessarily restrictive.

*Id.*[2]

Therefore, the Magistrate Judge determined that, even if the limitation regarding dust eliminated the entire 1,700 regional assembly jobs (58,000 nationally), Shinaberry retained the residual functional capacity to perform the general office clerk jobs (2,400/ 86,000) and surveillance system monitor jobs (500/13,000).

Significantly, in formulating his question, the ALJ relied mainly on Shinaberry's own treating physician's opinion that he could perform a limited range of sedentary work. Therefore, the Magistrate Judge determined that the record contains substantial evidence to support the ALJ's hypothetical question and that the hypothetical accurately reflected all of the limitations substantially supported by the record. The Court agrees.

## VII. CONCLUSION

After careful examination of his objections, it appears to the Court that Shinaberry's objections have not raised any issues that were not thoroughly considered by Magistrate Judge Kaull in his report and recommendation. Moreover, after an independent *de novo* consideration of all

---

**1.** Quesenberry is attached to this Order adopting the Magistrate Judge's Report and Recommendation.■

**2.** Wilcox is attached to this Order adopting the Magistrate Judge's Report and Recommendation.■

matters now before it, the Court is of the opinion that the Report and Recommendation accurately reflects the law applicable to the facts and circumstances before the Court in this action. The Court, therefore,

**ORDERS** that Magistrate Kaull's Report and Recommendation be accepted in whole and that this civil action be disposed of in accordance with the recommendation of the Magistrate. Accordingly,

1. The defendant's motion for Summary Judgment (Docket No. 12) is **GRANTED;**

2. The plaintiff's motion for Summary Judgment (Docket No. 9) is **DENIED;** and

3. This civil action is **DISMISSED WITH PREJUDICE** and **RETIRED** from the docket of this Court.

The Clerk of Court is directed to enter a separate judgment order. Fed.R.Civ.P. 58.

The Clerk of the Court is directed to transmit copies of this Order to counsel of record.

## *REPORT AND RECOMMENDATION/OPINION*

JOHN S. KAULL, United States Magistrate Judge.

JERRY L. SHINABERRY, Plaintiff,

v.

MICHAEL J. ASTRUE,[1] COMMISSIONER OF SOCIAL SECURITY, Defendant.

This is an action for judicial review of the final decision of the defendant Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner") denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on Plaintiff's Motion for Judgment on the Pleadings and Defendant's Motion for Summary Judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b).

## *I. PROCEDURAL HISTORY*

Jerry L. Shinaberry ("Plaintiff") protectively filed an application for DIB on June 3, 2003, alleging disability due to shortness of breath, chest pain, and lower back and leg pain (R. 63–65, 160). Plaintiff's applications were denied at the initial and reconsideration levels (R. 30–31). Plaintiff requested a hearing, which Administrative Law Judge Mark O'Hara ("ALJ") held on August 9, 2005 (R. 44–45, 622). Plaintiff, who was represented by counsel, testified on his own behalf (R. 6–25–41). Also testifying were Vocational Expert ("VE") J. Herbert Pearis (R. 645–52) and Vicki Shinaberry, Plaintiff's wife (R. 641–45). On December 19, 2005, the ALJ entered a decision finding Plaintiff retained the residual functional capacity to perform sedentary work (R. 12–29). On January 31, 2006, Plaintiff filed a Request for Review of Hearing Decision with the Appeals Council (R. 10–11). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 6–8).

## *II. FACTS*

Plaintiff was born on July 12, 1956, and was 43 years old when he stopped work-

---

**1.** On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted, therefore, for former Commissioner Jo Anne B. Barnhart (or Acting Commissioner Linda L. McMahon [if the caption was changed previously]) as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

ing, 46 years old when he filed his application, and 49 years old at the time of the administrative hearing. He has an eleventh grade education and past relevant work as a coal mine machine operator (R. 15, 161).

On April 19, 2000, John D. Sharp, Ph.D., D.O., began medical care of Plaintiff for back pain. On this date, Plaintiff presented to Dr. Sharp with complaints that his back pain radiated to his hips and tailbone. Plaintiff stated he had injured his back by either pulling a cable at work or lifting a motor at home. Dr. Sharp prescribed Vioxx and referred Plaintiff to Dr. Douglas (R. 462).

On April 21, 2000, Plaintiff underwent a MRI of his lumbar spine. It showed degenerative disc disease "particularly effecting [sic] lower 2 or 3 lumbar vertebral levels as well as T12–L1 and L1–2." There was neural foraminal encroachment effacement inferiorly at the L4–5 level. There was no evidence of spinal canal stenosis or nerve root impingement (R. 461).

Also on April 21, 2000, Plaintiff had a x-ray made of his lumbar spine, which showed "arthritic degenerative change with hyperostotic spurring" and possible "narrowing at L5–S1." Dextroscoliosis was found in the thorcolumbar area (R. 460).

Plaintiff returned to Dr. Sharp on April 25, 2000, and informed him that the superintendent at the mine where he worked would "let [him] go back to light duty" but he "would like to file for" workers' compensation as his "back injury [was] related to work." Dr. Sharp continued Plaintiff on Vioxx and began processing Plaintiff's paperwork for his worker's compensation claim (R. 459).

On April 28, 2000, Plaintiff's Safety director at his employer wrote the following:

On or about April 15, 2000, Jerry Shinaberry ... came into the bath house walking with difficulty before the start of his shift. I asked Jerry what was wrong, had he gotten hurt the night before? Jerry replied "I was lifting a Subaru engine and hurt my back." Jerry then said if his back did not improve soon, that he was going to the doctor. Jerry started off work on April 19, 2000. On April 27, 2000, Larry Jones, superintendent of [the mine] and Jerry came into my office. Larry asked Jerry why he was now claiming on the job injury, when Jerry had told both of us previously, that he had injured his back lifting a Subaru engine. Jerry replied that his Dr. told him the lumbar sacral strain in his back and his herniated lumbar disc came from handling the miner cable all the time.

Mr. Ashley then stated that Plaintiff said he had to file for workers' compensation because he was going to lose his house. His statement, as written by Ashley, is as follows:

About 4–11–00 at about 10:00 PM my back started hurting while pulling miner cable. My back had been hurting since early in the year. I started going to Dr. Sharp in January and have been going about every (3) months since January.

On May 9, 2000, Plaintiff presented to Richard A. Douglas, M.D., F.A.C.S., with complaints of low back pain and bilateral gluteal pain. Plaintiff stated he "presumed" he pulled a muscle on April 11, 2000, at work when he "pull[ed] a cable into the miner" and at home when he did additional lifting. Dr. Douglas found Plaintiff had no pleurisy or cough. Plaintiff complained of shortness of breath with activities. Plaintiff did not have unstable gait (R. 233). Plaintiff stated he was treating his back condition with Lorcet, Alprazolam, and Vioxx. Plaintiff informed Dr. Douglas that he consumed one ounce of alcohol per week and used three cans of snuff per week. Dr. Douglas observed no cyanosis, clubbing, or edema of Plaintiff's

extremities. He had minimal lumbar paravertebral spasm, negative straight leg raising test at ninety degrees, and negative internal and external rotation of femurs, bilaterally (R. 234). Plaintiff's motor strength was 5/5 in all major muscle groups, sensory examination was intact, and cerebellar examination was normal. Dr. Douglas reviewed Plaintiff's April 21, 2000, lumbosacral spine MRI and opined it revealed degenerative disc disease of the lumbar spine, with no disc herniation, fracture, or spinal stenosis (R. 235). Dr. Douglas did not recommend neurosurgical intervention but referred Plaintiff to physical therapy and pain management (R. 236).

On May 22, 24, 26, and 30, 2000, and June 1, 5, 8, and 13, 2000, Dr. Sharp treated Plaintiff's low back condition with a TENS unit, osteopathic manipulative technique ["OMT"], and ultrasound therapy (R. 456–57).

On June 16, 2000, Plaintiff was treated by Dr. Sharp with a TENS unit, OMT, and ultrasound therapy for his back pain. Plaintiff informed Dr. Sharp that he could not bend his neck and he could not stand for long periods. Dr. Sharp prescribed Vioxx, Lorcet, and Xanax (R. 455).

On June 20, 27, and 29, 2000, and July 6, 11, and 13, 2000, Dr. Sharp treated Plaintiff's low back condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 452–54).

On July 18, 2000, Plaintiff reported to Dr. Sharp that his back pain continued but that the regular pain medication "[did] something" to alleviate it. Plaintiff's buttocks were numb and he could not sit. Mowing the grass exacerbated his pain. Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 452).

On July 25 and 27, 2000, and August 3 and 8, 2000, Dr. Sharp treated Plaintiff's low back condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 451–52).

On August 17, 2000, Plaintiff complained of having "bad days" due to pain. Dr. Sharp prescribed Lorcet and Xanax. He provided samples of Vioxx to Plaintiff (R. 450).

On August 29, 2000, Plaintiff complained of severe back pain to Dr. Sharp, which was the result of his having "worked on truck." Dr. Sharp treated Plaintiff's back pain with a TENS unit, hot packs, OMT, and ultrasound therapy on this date and also on August 31, and September 7, 2000 (R. 450).

On September 13, 2000, Plaintiff informed Dr. Sharp that there was a "popping" in his back and the pain was getting lower and worse. Plaintiff stated he woke every two to three hours due to pain. Plaintiff stated he was "trying to walk some," but could not walk up hills. Dr. Sharp prescribed Lorcet and Vioxx and treated Plaintiff with TENS unit, hot packs, OMT, and ultrasound therapy (R. 449).

On November 2, 7, 14, 16, 28, and 30, 2000, and December 5, 7, 12, and 14, 2000, Dr. Sharp treated Plaintiff's back pain with a TENS unit, hot packs, OMT, and ultrasound therapy. Also on December 14, 2000, Dr. Sharp prescribed Xanax and Lorcet to Plaintiff (R. 448).

On November 7, 2000, Dr. Sharp corresponded with Richard Cardos relative to Plaintiff's worker's compensation claim as follows:

As I said before, (I think) that Jerry Shinaberry has pulled his low back lifting on a motor but he did continue to work. He then injured his back pulling a cable etc. in the coalmines. The "straw that broke the camels back" was the incident in the coalmine, which should be a compensable injury. I hope this can be cleared soon so that Mr. Shinaberry will be able to receive the proper appropriate medical care to re-

pair his back in order for him to return to work as a productive citizen. (R. 446–447).

On December 21, 2000, and January 2 and 4, 2001, Dr. Sharp treated Plaintiff's back condition with a TENS unit, hot packs, OMT, and ultra sound therapy (R. 445).

On January 5, 2001, Plaintiff's back pain was treated by a TENS unit, hot pack, OMT, and ultrasound therapy by Dr. Sharp. His lungs were clear to auscultation. Plaintiff reported he had "slip[ped] a little on ice," causing his back to twist. Plaintiff stated he was "getting depressed waiting on" workers' compensation to decide his claim. Plaintiff's straight leg raising test was negative at seventy degrees on the left and eighty-five degrees on the right (R. 445).

Plaintiff's back pain was treated with a TENS unit, hot packs, OMT, and ultrasound therapy by Dr. Sharp on January 9, 11, 16, 18, and 30, 2001; February 1, 6, 8, 13, 15, 20, 22, and 27, 2001; and March 1, 2, 8, and 13, 2001 (R. 424, 441–44).

On March 14, 2001, Plaintiff presented to Dr. Sharp with complaints of being "stiff all over" and having severe pain in low back and hips. Plaintiff's range of motion was reduced and his neck abduction/adduction were reduced. Dr. Sharp diagnosed chronic low back pain. He treated Plaintiff with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 441).

On April 10 and 13, 2001, Plaintiff's back condition was treated by Dr. Sharp with a TENS unit, hot packs, OMT, and ultrasound therapy. On April 13, Plaintiff stated he could not sleep and was depressed. Plaintiff complained of numbness and pain that radiated to his legs and knees (R. 423, 440).

On May 1, 2001, Plaintiff underwent a bone scan, which was positive for "minor degenerative change." "[N]o evidence of metastatic deposit" and "no minor degenerative type activity over the major joints" were found (R. 423, 439).

On May 7, 2001, Dr. Sharp treated Plaintiff's back condition with a TENS unit, hot pack, OMT, and ultrasound therapy. He reviewed the May 1, 2001, bone scan and opined it was normal. Plaintiff informed Dr. Sharp that he was "overall getting worse" in that he could not bend forward and that a trip to Lewisburg, West Virginia, "killed" him. Dr. Sharp referred Plaintiff to a Charleston, West Virginia, pain clinic. He also noted Plaintiff may consider physical therapy as treatment (R. 424).

On May 14, 2001, Plaintiff reported to Dr. Sharp that he was "fair." He had been "trying to turkey hunt" and had been walking. He received treatment with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 438).

On May 17 and 22, 2001, Plaintiff was treated for his back condition with a TENS unit, hot packs, OMT, and ultrasound therapy by Dr. Sharp. On May 22, 2001, Dr. Sharp prescribed Lorcet and Xanax (R. 438).

Dr. Sharp treated Plaintiff's back condition with TENS unit, hot packs, OMT, and ultrasound therapy on May 24 and 30, 2001, and June 5, 12, and 17, 2001 (R. 437).

On June 19, 2001, Plaintiff presented to Dr. Sharp with complaints of sleeplessness due to pain, inability to lift more than ten to fifteen pounds, and continuous pain, which radiated down both legs. Plaintiff's straight leg raising test was negative at sixty degrees on right and seventy degrees on the left. Plaintiff was waiting for workers' compensation approval for treatment at the pain clinic (R. 436). On June 21, 26, and 28, 2001, and July 3, and 5, 2001, Plaintiff was treated with a TENS unit,

hot packs, OMT, and ultrasound therapy for his back pain by Dr. Sharp (R. 435).

On July 9, 2001, Dr. Sharp treated Plaintiff with a TENS unit, hot packs, OMT, and ultrasound therapy for his back pain. Plaintiff stated he was unable to bend or pick up anything. Plaintiff stated he could not sleep and his pain never subsided. Plaintiff stated his back pain radiated to his right hip (R. 432).

On July 16, 2001, Dr. Sharp corresponded with West Virginia Workers' Compensation Division, seeking authorization to refer Plaintiff to Raymond Harron, M.D., a neurosurgeon, and for Plaintiff to undergo a MRI. Dr. Sharp wrote Plaintiff was temporarily totally disabled (R. 434).

On July 17, 19, 24, and 31, 2001, Dr. Sharp treated Plaintiff's back condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 433).

In early September, Plaintiff reported to Dr. Sharp that he experienced pain and numbness in his right leg. Plaintiff stated he tried to walk and could not sleep. Dr. Sharp prescribed Vioxx, Lorcet, and Xanax (R. 431).

On September 13, 2001, Plaintiff was examined by A. E. Landis, M.D., for his back condition. Dr. Landis reviewed "various medical records" of Plaintiff, which were provided to him, a neurosurgical consultation from the West Virginia Neurosurgery and Spine Center in Clarksburg, and "various MRI and x-ray reports." Plaintiff reported he had injured his back at work in April, 2000, and had been treated conservatively (R. 249).

Plaintiff reported his pain was located in the middle of his lower back and was present at all times. Bending, lifting, prolonged standing, prolonged walking, and prolonged sitting increased his pain. Plaintiff reported his pain radiated to his right thigh and knee and increased when he lay down. Plaintiff stated he experienced numbness and tingling in his right thigh to his knee. Plaintiff stated Vioxx relieved his symptoms, but he had been taken off that medication and not returned to it. Plaintiff reported a TENS unit helped his symptoms "if he use[d] it long enough" (R. 250).

Dr. Landis found Plaintiff was in no distress and moved without restrictions. Plaintiff did not limp or need assistance in dressing or undressing or getting up on and down from the examination table. Plaintiff complained of back pain with range of motion testing, without any radicular component. Plaintiff had no tenderness or spasm. He could heel and toe walk. Supine straight leg raising test was forty-five degrees with pain and without radiation. Sitting straight leg raising test was 180 degrees. Plaintiff's sensory examination was intact in lower extremities, and his reflexes were brisk and symmetrical (R. 251). X-rays made that day and reviewed by Dr. Landis revealed degenerative lipping and minimal narrowing (R. 251). Dr. Landis noted Plaintiff's MRI scan showed no disc herniation or spinal stenosis and his bone scan was normal (R. 250).

In conjunction with the IME, Dr. Landis completed a Low Back Examination form of Plaintiff. He found Plaintiff stood unassisted, and had no scoliosis, antalgic lean, lumbar hypolordosis, or lumbar hyperlordosis. He found Plaintiff had no vertebral or coccyx tenderness to palpation. He had sacral base and pelvis level tenderness to palpation. Dr. Landis opined Plaintiff had no paraspinal muscle tenderness or spasm or sacroiliac joint tenderness, bilaterally. He did not attempt to squat. Plaintiff's range of motion results were as follows: sacral flexion ten degrees with pain; sacral extension five degrees with pain; forward bending thirty degrees with pain; backward bending fifteen degrees with pain,

left side bending twenty degrees with pain; and right side bending twenty degrees with pain. Dr. Landis found Plaintiff's injury was not stable, his ranges of motion were curtailed due to pain, his three consecutive measurements were within five degrees of each other, and Plaintiff did not pass a validity test (R. 427). Plaintiff had normal motor strength in the following; hip flexion, hip extension, hip abduction, knee extension, knee flexion, ankle dorsiflexion, ankle planter flexion, great toe extension, heel toe walk, and toe walk (R. 428).

Dr. Landis diagnosed Plaintiff with "strain/sprain type of injury to his lower back ... superimposed on some pre-existing degenerative changes ..." (R. 251). He recommended Plaintiff treat his condition with "aggressive stretching exercise" and Vioxx (R. 252).

On October 3, 2001, Dr. Sharp treated Plaintiff's back pain with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 422).

On October 9, 2001, Plaintiff informed Dr. Sharp that his back pain was worse, he had numbness from his hip to his knee, and he had pain in his groin area. Dr. Sharp treated Plaintiff's pain with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 422).

On October 25, 2001, Plaintiff reported to Dr. Sharp that Vioxx was upsetting his stomach. Plaintiff reported pain in his groin area and that it was difficult for him to stand (R. 421)

On October 26, 2001, Plaintiff returned to Dr. Sharp for refills of his Vioxx and Lorcet. Plaintiff stated he could not sleep. Dr. Sharp recommended Plaintiff begin physical therapy (R. 422).

On January 8, 2002, Plaintiff was treated by Dr. Sharp with a TENS unit, hot pack, OMT, and ultrasound therapy for his back condition (R. 420).

On January 16, 2002, Plaintiff presented to Dr. Sharp with complaints of moderate to severe pain and soreness in his spine. Plaintiff stated he experienced episodes of his entire back hurting. Plaintiff stated he could not bend to pick up anything and that he could "hardly put shoes on." Plaintiff informed Dr. Sharp that physical therapy made his condition worse. His straight leg raising test was negative at sixty degrees on the right and eighty-five degrees on the left. Dr. Sharp prescribed a home TENS unit and Vioxx to Plaintiff (R. 420).

On March 18, 2002, Plaintiff had a x-ray made of his lumbar spine. It showed minor disc space narrowing at T12–L1 and L1–2 and mild marginal spurring. The impression was for "mild degenerative change" (R. 419).

Also on March 18, 2002, a MRI was made of Plaintiff's lumbar spine. The impression was for "mild degenerative disc disease and tiny central disc protrusions noted T12–L1 and L1–2" and "no other significant abnormalities [were] seen and there [was] no demonstrable metastatic disease" (R. 418).

On May 8, 2002, Plaintiff was evaluated by Raymond V. Harron, D.O. Dr. Harron reviewed Plaintiff's March, 2002, MRI scan and found "no real significant change in his study in comparison from the study of 2000." Dr. Harron noted "some degenerative changes up at the T12–L1 and L1–L2 region [and] L4–L5 level." Plaintiff's examination was normal (R. 254).

On June 3, 2002, Plaintiff underwent a lumbar myelogram CT scan. It showed "mild diffuse disc bulge at L4–5 without significant mass effect" and "mild disc bulge L5–S1 without significant mass effect" (R. 415). The lumbar myelogram also showed minimal anterior epidural impression at L3–4 and L4–5 and no lateralizing (R. 414).

Dr. Landis examined Plaintiff on June 10, 2002 (R. 237). Upon examination, Dr. Landis found Plaintiff was in no distress, moved without restriction, did not limp, and could dress, undress, and get up on and down from the examination table without difficulty. Plaintiff's range of motion was forward flexion forty degrees, extension fifteen degrees, right side bending twenty degrees, and left side bending twenty-five degrees, with complaints of pain and no radiation. Plaintiff had no spasm and could heel and toe walk without difficulty. Plaintiff had some tenderness to palpation at L5–S1. Plaintiff's sitting straight leg raising test was 180 degrees and his supine straight leg raising test was forty five degrees due to pain and without radiation. There was no motor weakness in the lower extremities (R. 238–39). Plaintiff reported none of the treatments he had received relieved his symptoms to any extent, but therapy and medication relieved his spasms (R. 238).

Dr. Landis reviewed Plaintiff's June 3, 2002, myelogram/post myelogram CT scan, and opined they showed no disc herniation and no neurosurgical lesion. He found Plaintiff's x-rays revealed degenerative changes at L1 on the left, anterior lipping, mild narrowing at L5–S1, mild facet joint changes at L5–S1, and superior lipping (R. 239).

Dr. Landis opined Plaintiff had reached maximum degree of medical improvement from his strain/sprain injury and did not require any additional treatment. He found Plaintiff was no longer temporarily totally disabled and was "certainly capable of performing at least sedentary type work" (R. 239).

On June 26, 2002, Dr. Harron communicated with Dr. Sharp that he had reviewed Plaintiff's lumbar myelogram and post-myelographic CT scan and found Plaintiff had mild disc bulging at L4–L5 and L5–S1, but no nerve root or spinal cord compression. Dr. Harron opined Plaintiff did not require surgery and should be treated conservatively for his condition (R. 253).

On July 2, 2002, Dr. Sharp noted Plaintiff had tenderness at his L1–2 area. Plaintiff stated he could not "do anything." Dr. Sharp treated Plaintiff's condition with a TENS unit, hot packs, OMT, and ultrasound therapy (R. 425).

On July 18, 2002, Plaintiff reported to Dr. Sharp that "driving kill[ed]" him, that he could not perform yard work or operate a chain saw (R. 426).

On August 26, 2002, Plaintiff informed Dr. Sharp he had continued back, tailbone, and groin pain. Plaintiff stated he had driven to Elkins and back to home, which caused him to be unable to sit. He was treated with a TENS unit, hot pack, OMT and ultrasound therapy (R. 413).

On September 17, 2002, Plaintiff presented to Dr. Sharp with complaints of pain down the back of his right leg to his ankle and spasms to his mid back. Plaintiff's condition was treated with a TENS unit, hot packs, OMT, and ultrasound therapy. Dr. Sharp provided Celebrex samples to Plaintiff and prescribed Lorcet, Xanax, and Zanaflex (R. 412).

On September 18, 2002, Plaintiff presented to Dr. Sharp with complaints of continuing groin pain and back pain that radiated to his hips. Plaintiff stated he had a "knot on [right] side [of] back [at] S1." Plaintiff reported pain in his groin to his ankle when he tried to cut firewood. Plaintiff's straight leg raising test was forty degrees on the right and sixty degrees on the left (R. 411).

On October 16, 2002, Plaintiff presented to McClung Health & Wellness Center and was examined by Charles McClung, D.O. Plaintiff stated he had low back pain, right leg numbness into his knee, and muscle spasms in left back. Dr. McClung noted

Plaintiff's lumbar myelogram was negative. He diagnosed lumbar sprain (R. 296). Dr. McClung recommended Plaintiff treat his back pain with ligament injections to his lower thoracic and lumbar spine every two weeks for a four-month period (R. 297, 410).

On October 22, 2002, Plaintiff presented to Dr. Sharp with complaints of severe pain in his right leg, numbness, groin pain, and severe muscle spasms in his right back. Plaintiff stated he could not bend forward to pick up anything from the floor. He was treated with a TENS unit, hot pack, OMT, and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax, and Zanaflex (R. 409).

Plaintiff reported to Dr. Sharp on October 30, 2002, that his back pain continued and that bending over the day before caused his back pain to become "severe." Dr. Sharp diagnosed "low back chronic pain."

On November 7, 2002, Plaintiff was treated by Dr. Sharp with a TENS unit, hot packs, OMT, and ultrasound therapy. Plaintiff reported Vioxx was not "helping" relieve his pain (R. 407).

On November 18, 2002, Plaintiff reported to Dr. Sharp that his low back pain continued, rehabilitation therapy was making his condition worse, he was not sleeping, his right leg was numb and he still had pain in his groin. Dr. Sharp treated his symptoms with a TENS unit, a hot pack, OMT, and ultrasound therapy (R. 406).

On December 4, 2002, Plaintiff received an ligament injection from Dr. McClung, which, according to Plaintiff, caused back spasms and did not relieve his pain (R. 294, 295).

On December 10, 2002, Plaintiff reported to Dr. Sharp that his back pain was worse and that he had muscle spasms. He was treated with a TENS unit, hot pack, OMT, and ultrasound therapy. Dr. Sharp prescribed Lorcet, Xanax, and Vioxx (R. 405).

On December 19, 2002, Plaintiff received another injection from Dr. McClung (R. 294).

On January 8, 2003, Plaintiff reported to Dr. McClung that his previous injection had "helped for 1 to 1 1/2 days" and that he experienced lower back pain on both sides of his spine. Dr. McClung gave Plaintiff an ligament injection (R. 293).

On January 9, 16, and 23, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. He was treated with a TENS unit, a hot pack, OMT, and ultrasound therapy (R. 402–04).

On January 22, 2003, Plaintiff reported to Dr. McClung that his previous injection "felt good [for] 3 days past injections." Plaintiff received a ligament injection (R. 292).

On January 27, 2003, Plaintiff told Dr. Sharp his pain was "bad again," his "back muscles [were] hard as knots," and he was "ok" if he did not do anything, but "down 3 days" if he did. Dr. Sharp opined Plaintiff should participate in physical therapy and work hardening; treated him with a TENS unit, hot pack, OMT, and ultrasound therapy; and prescribed Zanaflex, Xanax, and Vioxx (R. 401).

On February 12, 2003, Plaintiff reported to Dr. McClung his previous injection caused "alot [sic] of pain & muscle spasms [for] 2 weeks." Plaintiff stated he had been doing better until he trimmed trees. Plaintiff received a ligament injection (R. 291). Plaintiff also received an injection from Dr. McClung on March 5, 2003 (R. 290).

On March 14, 2003, a x-ray was made of Plaintiff's chest. It revealed "interstitial fibrosis with progressive mass of fibrosises [sic] highly consistent with a coal worker's pneumoconiosis" (R. 255).

Also on March 14, 2003, a pulmonary function test showed "mild restriction." Plaintiff's predicted FVC was 4.58 liters and the actual readings were 3.36 (73.44% of predicted), 3.22 (70.33% of predicted) and 3.18 (69.40% of predicted). Plaintiff's predicted FEV-1 was 3.74 liters and the actual readings were 2.56 (68.58% of predicted), 2.67 (71.41% of predicted), and 2.63 (70.51 of predicted) (R. 259).

On March 19, 2003, Plaintiff reported to Dr. McClung his pain had increased because he had had driven his car for two hours. Dr. McClung noted Plaintiff had reduced swelling of his low back muscle. Plaintiff reported pain relief for two days from his previous injection. Plaintiff received a ligament injection (R. 289).

On March 25, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. He stated he had numbness down the right leg to his knee and muscle spasm in his thoracic spine. Plaintiff reported a "knot came out on [his] spine" and "went away [by his] using heat & ice" (R. 400).

On March 28, 2003, Plaintiff reported he had realized "alot" (sic) of relief from his previous injection from Dr. McClung (R. 288).

On March 31, 2003, Plaintiff returned to Dr. Sharp, where he was treated for his back condition with a TENS unit, a hot pack, OMT, and ultrasound therapy. He reported the ligament injections he was receiving from Dr. McClung were "helping some." Dr. Sharp prescribed Lorcet, Vioxx, and Xanax to Plaintiff (R. 399).

On April 7, 2003, Plaintiff received an epidural lumbar injection from Dr. McClung. Plaintiff reported the injections helped relieve spasms and he had "tried to run power saw" (R. 287).

On April 8, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain, chest pain, and shortness of breath (R. 398).

On the 10th of April, 2003, Plaintiff was treated by Dr. Sharp with a TENS unit, a hot pack, OMT, and ultrasound therapy for his continued back pain. Dr. Sharp ordered a x-ray of Plaintiff's chest and noted it may have shown a mass in the right upper lobe. Plaintiff's EKG was normal. Dr. Sharp, based on his reading of the chest x-ray, referred Plaintiff to a pulmonologist (R. 397).

On April 15 and 16, 2003, Plaintiff was treated for his back condition by Dr. Sharp with a TENS unit, a hot pack, OMT, and ultrasound therapy (R. 395, 396).

On April 16, 2003, Dr. Sharp completed a Physician's Report of Occupational Pneumoconiosis of Plaintiff for West Virginia Workers' Compensation Fund. He noted he had first treated or examined Plaintiff for this condition on March 14, 2003. He opined Plaintiff had never had and did not then have pneumonia, pleurisy, asthma, tuberculosis, angina pectoris, coronary occlusion, rheumatic heart disease, congestive heart failure, or arthritis. Dr. Sharp noted Plaintiff's current complaints were for dry cough for five years, shortness of breath (worse with exertion) for five years, wheezing (with exertion) for five years, and orthopnea (R. 393). Dr. Sharp opined Plaintiff's breath sounds were coarse. He noted Plaintiff had chest pain and shortness of breath with increased to normal exercise. Dr. Sharp wrote Plaintiff's "SOB and sweats had increased over the past year" (R. 394).

On April 17, 2003, Jaroslaw Pondo, M.D., completed a Routine Abstract Form–Physical of Plaintiff (R. 318). Plaintiff's gait, station, fine motor ability, gross motor ability, joints, and muscle bulk were all normal. Plaintiff's ranges of motion, reflexes, sensory deficits, motor strength, coordination, and mental status were nor-

mal. Plaintiff's cardiovascular examination was normal. Plaintiff's breath sounds were abnormal; his dyspnea, with exertion, was normal. Plaintiff's orthopnea, cyanosis, and edema were normal (R. 319). Plaintiff's digestive system was normal (R. 320). Plaintiff was diagnosed with pneumoconiosis (R. 317).

On April 17, 2003, a CT scan was made of Plaintiff's chest. It showed "pneumoconiosis, denser and more massive on the right" (R. 316).

On April 21, 2003, the State Division of Rehabilitation Services submitted a Vocational Progress Report (R. 195). Under Summary of Vocational Issues, the reviewer wrote:

> Right now Jerry is very concerned about the nature and the extent of his lung problem and treatment options, which undoubtably will affect his return to work potential. He has shortness of breath with minimal exertion. He is equally limited by his pulmonary and his musculoskeletal conditions. A return to work in the coal mines is looking less and less likely. He has earned very good wages and lacks the education and skills to obtain more sedentary and undoubtedly more technical and clerical types of work that would provide commensurate wages. In addition, he lives in a very rural area where employment options are very limited and he does not want to relocate. Improvement in physical functioning and improvement in academic achievement are critical to successfully return to work.

On April 22, 2003, Plaintiff was admitted, for a "short stay," to Davis Memorial Hospital. He was diagnosed with pneumoconiosis (R. 314). The x-ray made that day at the Davis Memorial Hospital showed no pneumothorax and no pneumomediastinum (R. 313). Also on this date, Plaintiff underwent a right upper lobe lung washing. It showed no malignancy (R.

312). The biopsy of Plaintiff's right upper lobe of his lung, taken on April 22, 2003, showed "bronchial mucosa with fibrosis, chronic inflammation, and deposition of both polarizable and non-polarizable foreign material consistent with anthracosis and silicosis" (R. 310–11).

On April 23, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. He reported numbness in his arm. Plaintiff stated his pain was chronic. Plaintiff was treated with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 392).

On April 30, 2003, Plaintiff returned to Dr. Sharp for TENS unit, hot pack, OMT and ultrasound therapy treatment for his back. Plaintiff reported pain between his shoulders to his neck and shortness of breath with exertion. Dr. Sharp prescribed Lorcet, Vioxx, Xanax, and Zanaflex (R. 391).

On May 5, 14, 23, and June 2, 2003, Plaintiff reported significant pain in his back to Dr. McClung. He received ligament injections (R. 283–86).

On May 6, 2003, Plaintiff reported to Dr. Sharp that he had undergone manipulation therapy with Dr. McClung on May 5 and he "felt something catch in [his] back." Plaintiff was treated with TENS unit, hot pack, and ultrasound therapy (R. 390).

On May 9, 2003, Plaintiff was examined by Dr. Pondo, who found his neck supple and his chest clear to auscultation. There was no clubbing, cyanosis, or edema in his extremities. Plaintiff was neurologically intact. Plaintiff was diagnosed with pneumoconiosis and silicosis (R. 309).

On May 15, 2003, Plaintiff reported to Dr. Sharp that he had received a ligament injection to his spine on May 14, 2003, and that it was "helping" his back pain. Plaintiff was treated with a TENS unit, hot pack, OMT, and ultrasound therapy. He

was referred by Dr. Sharp to TriState Occupational Rehabilitation (R. 389).

Plaintiff reported to Dr. Sharp on May 22, 2003, that his low back pain continued but that the ligament injections provided by Dr. McClung were "helping." Plaintiff was treated with TENS unit, hot pack, OMT, and ultrasound therapy (R. 388).

Plaintiff was again treated for low back pain by Dr. Sharp on May 27, 2003, with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 387).

On June 3, 2003, Plaintiff reported to Dr. Sharp that he had received a ligament injection from Dr. McClung on June 2, 2003. Plaintiff stated he had developed neck pain about one and one-half months ago. He had received manipulation therapy from Dr. McClung, but reported pain between his shoulders and into his neck caused severe headaches. Plaintiff stated his neck "grind[ed] and pop[ped]" and was "tight." Dr. Sharp prescribed Toradol, Lorcet, Medrol DosePak, and Percocet (R. 386).

On June 11, 2003, Plaintiff reported neck pain to Dr. McClung and reported his last injection "helped" for three days. Plaintiff received an injection (R. 282).

Plaintiff reported neck pain and headaches to Dr. Sharp on June 12, 2003. Plaintiff was instructed to treat his symptoms with a home TENS unit. Dr. Sharp scheduled an appointment for Plaintiff with TriState Occupational Rehabilitation for June 20, 2003 (R. 385).

On June 24, 2003, Plaintiff presented to Dr. Sharp with complaints of constant low back pain and neck pain. He reported he had experienced a flat tire, but could not change it himself. Dr. Sharp treated Plaintiff with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 384).

On July 1, 2003, Plaintiff reported to Dr. Sharp he experienced increased cervical pain. He was treated with a TENS unit and hot pack to his neck. Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 383).

On July 9, 2003, Plaintiff informed Dr. McClung he did not want additional injections to his neck as it caused soreness. He realized relief from back pain for fourteen days from his previous ligament injection. Plaintiff received a lumbar injection (R. 281).

On July 11, 2003, Dr. Pondo examined Plaintiff. Plaintiff denied "any shortness of breath more than usual." Plaintiff stated he experienced "on and off" chest pain and no hemoptysis. Plaintiff's chest was clear to auscultation; his heart rate was regular; he had no clubbing, cyanosis, or edema; his neurological examination was intact. Plaintiff was diagnosed with pneumoconiosis/silicosis (R. 308).

On July 18, 2003, Plaintiff reported to Dr. McClung his previous injection "helped for a few days," but he experienced neck, low back, and groin pain. He received a ligament injection (R. 280).

On July 21, 2003, Plaintiff reported to Dr. Sharp he had fallen on a concrete floor and had injured his neck. Dr. Sharp treated him with a TENS unit, hot pack, OMT, and ultrasound therapy; prescribed Percocet; and referred Plaintiff to a pain clinic in Charleston, West Virginia (R. 382).

On July 23, 2003, Plaintiff was treated by Dr. Sharp with a TENS unit, hot pack, OMT, and ultrasound therapy; Toradol was prescribed (R. 381).

On July 24, 2003, Plaintiff underwent a pulmonary function study at Occupational Lung Center for the West Virginia Occupational Pneumoconiosis Board. Plaintiff performed this test while resting and only pre-bronchodilator due to heart disease. Plaintiff's spirometry ranged from fifty-three to eighty-five percent of predicted value. Plaintiff's diffusion ranged from

sixty and eighty-nine percent of predicted value (R. 113, 474, 477, 510).

Plaintiff received a ligament injection from Dr. McClung on July 28, 2003, after informing the doctor that the injections were "helping the back some" (R. 279).

On July 31, 2003, Plaintiff presented to Pocahontas Medical Clinic with cough, chest congestion, sinus drainage, and temperature. He was treated by a physician's assistant. He was prescribed Levaquin, Atrovent, Albuterol, and Advair (R. 380).

On August 5, 2003, Plaintiff was treated for his back pain with a TENS unit, hot pack, and ultrasound therapy by Dr. Sharp (R. 379).

Also on August 5, 2003, Dr. Sharp completed a Routine Abstract Form Physical of Plaintiff for the Disability Determination Section of the State of West Virginia. Dr. Sharp noted Plaintiff had been diagnosed with COPD, Black Lung disease, lumbosacral strain, lumbar disc disease and "c-strain." Dr. Sharp opined Plaintiff's respiration was sixteen and that he walked with a limp (R. 376). Dr. Sharp found Plaintiff's vision abnormal, but his hearing and speech normal. Dr. Sharp opined Plaintiff's joints were normal. He found the following musculoskeletal components abnormal: gait and station due to limp; legs' fine motor ability; legs' gross motor ability, left and right lower extremities' ranges of motion; and right lower extremity's muscle bulk. Plaintiff's right lower extremity was abnormal in reflexes, sensory deficits, motor strength, coordination, frequency of seizures and/or blackouts, and mental status (Dr. Sharp noted Plaintiff was depressed). Plaintiff's respiratory functions of cyanosis and edema were normal; however his breath sounds, orthopnea, and dyspnea (with exertion and at rest) were found to be abnormal. Dr. Sharp found Plaintiff's heart sounds, extremities, and circulation were normal.

There was no evidence of congestive heart failure. Dr. Sharp found Plaintiff experienced chest pain due to his lungs, pneumonia, and chronic cough (R. 377). Plaintiff's digestive system was normal (R. 378).

Dr. Sharp noted Plaintiff received injections from Dr. McClung and had been examined for Black Lung disease. Dr. Sharp noted Plaintiff experienced chronic pain in his lumbar spine, right sciatic neuralgia, right leg numbness, and headaches. Dr. Sharp opined Plaintiff was unable to bend, lift, sit or ride for over twenty to thirty minutes. Dr. Sharp opined Plaintiff was "unable to engage in any physical exercise." Dr. Sharp found Plaintiff was "functionally limited" in "physical exercise and sitting." He found Plaintiff could "only drive over 30–40 minutes [with] rest" (R. 378).

On August 13, 2003, Plaintiff was treated by Dr. Sharp for his low back pain with a TENS unit, hot pack, OMT, and ultrasound therapy (R. 375).

On August 18, 2003, Plaintiff presented to Dr. Sharp and reported he continued to receive ligament injections and these "help[ed]" his low back pain; he experienced pain in his neck, pain in his right side, and numbness in his fourth and fifth right digits. Dr. Sharp noted Plaintiff's cervical spine was "tender" (R. 374).

On August 25, 2003, Dr. McClung noted Plaintiff had "improved mobility" in his "L/S spine" and that the last injection had "done good" in treating Plaintiff's back pain (R. 278).

On August 26, 2003, Plaintiff reported to Dr. Sharp that he had received a ligament injection on August 25, 2003, from Dr. McClung, which caused his back to feel "better." Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 373).

On September 4, 2003, Plaintiff presented to Dr. Sharp with complaints of contin-

ued back pain. Dr. Sharp noted Plaintiff's lumbar spine was tender; he had loss of lordosis; loss of range of motion; painful range of motion; and painful flexion, extension, and lateral rotation. He treated Plaintiff with a TENS unit, hot pack, OMT, and ultrasound therapy. Dr. Sharp prescribed Lorcet, Vioxx, and Xanax (R. 372).

On September 10, 2003, a state-agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The state-agency physician found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday, and push/pull unlimited (R. 261). Plaintiff was found to be frequently limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 262). The state-agency physician found Plaintiff had no manipulative, visual, or communicative limitations (R. 263–64). Plaintiff was found to be unlimited in his exposure to extreme cold and heat, wetness, humidity, noise, vibration, and hazards. The state-agency physician found Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (R. 264).

On September 11 and 16, 2003, Plaintiff was treated with a TENS unit, hot packs, and ultrasound therapy by Dr. Sharp for his pain (R. 370–71).

On September 24, 2003, Dr. Sharp wrote a letter to the West Virginia Workers' Compensation Division relative to Plaintiff's occupational pneumoconiosis. In the letter, Dr. Sharp sought approval for payment for pulmonology evaluations, a chest CT scan, endobronchial scoping, a PET scan, and prescriptions for Singulair and Albuterol (R. 368). Dr. Sharp wrote that recent x-rays of Plaintiff's chest showed increased densities in his lungs, as com-

pared with the 1998 x-rays. Dr. Sharp noted Singular and Albuterol "help[ed] [Plaintiff] to breath more easily" (R. 369, 504).

On October 2, 10, and 16, 2003, Plaintiff's symptoms were treated by Dr. Sharp with TENS unit and hot pack. Dr. Sharp prescribed Lorcet, Vioxx, Xanax, and Zanaflex to Plaintiff on October 2, 2003 (R. 365–67).

On October 9, October 20, and October 29, 2003, Plaintiff received ligament injections from Dr. McClung. Plaintiff reported the injections helped his pain and/or spasms (R. 274–76).

On October 16, 2003, Dr. Sharp wrote a letter of the West Virginia's Workers' Compensation Division, requesting authorization for treatment of Plaintiff for an acute lower respiratory infection. Dr. Sharp wrote the x-ray revealed Plaintiff had pneumonia, not mycloplasm, of his left lung. Plaintiff was positive for rales and rhonchi. Dr. Sharp had treated Plaintiff with injections of Claforan, DepoMedrol, and Vitamin B12 and provided him with samples of Avelox (R. 364, 503).

Plaintiff was treated with a TENS unit, hot pack, OMT, and ultrasound therapy by Dr. Sharp on October 21, 2003, for his back condition (R. 363).

On October 23, 2003, Plaintiff underwent a PET scan. The impression was for "findings most consistent with pneumoconiosis/silicosis" and "no evidence for extra thoracic abnormal uptake" (R. 362).

On October 30, 2003, Plaintiff presented to Dr. Sharp with complaints of continued back pain. Plaintiff stated he experienced numbness in his right leg to his knee "all the time." He was treated with a TENS unit and a hot pack. Dr. Sharp prescribed Lorcet, Vioxx and Xanax (R. 361).

On November 8, 2003, Plaintiff reported to Dr. McClung his sciatic nerve was much

better, but he still experienced back pain. He received an injection (R. 273).

On November 10, 2003, Plaintiff was examined by Dr. Pondo, who found his neck supple, his chest clear to auscultation, and him neurologically non focal. Dr. Pondo noted Plaintiff's PET scan was "positive in the lungs [m]asses no extra thoracic uptake," which was consistent with inflammation. He diagnosed Plaintiff with pneumoconiosis and prescribed Prednisone (R. 307).

On November 11, 2003, James E. Bland, M.D., examined Plaintiff's ears, nose, oral cavity, nasopharynx, hypopharynx, larynx, and neck. The examination was normal (R. 268–69).

On November 12, 2003, Plaintiff reported to Dr. Sharp that his back, neck, and shoulder pain continued and was treated with a TENS unit, hot pack, and ultrasound therapy. He reported he had received an injection from Dr. McClung, but it did not "help numbness & pain ..." (R. 360).

On November 19 and 25, 2003, and December 3, 2003, Plaintiff presented to Dr. Sharp with continued back pain. He was treated with TENS unit, hot pack, OMT, and ultrasound therapy. On December 3, 2003, Dr. Sharp prescribed Vioxx, Xanax, and Lorcet (R. 357–59).

On November 20, 2003, Plaintiff informed Dr. McClung that he still had some pain in his groin and some swelling in his lower back after the last injection, but that all of sciatic nerve pain was gone. Plaintiff received an injection (R. 272).

On December 3, 2003, Dr. Sharp wrote to the West Virginia Workers' Compensation Division, requesting approval for Singulair and Albuterol for Plaintiff. He wrote that Plaintiff continued to experience shortness of breath and occasional lung pain and that both of these medications "help[ed] to ease [his] discomfort and enable[d] him to breathe easier" (R. 356, 507).

Plaintiff received a ligament injection from Dr. McClung on December 8, 2003 (R. 271).

Plaintiff's examination by Dr. Pondo on December 11, 2003, yielded the same results as the examination on November 10, 2003. Dr. Pondo diagnosed "pneumoconiosis/massive" and progressive fibrosis. He ordered a CT scan to evaluate Plaintiff's response to Prednisone (R. 306).

On December 19, 2003, Plaintiff had a CT scan of his chest. The impression was for bilateral upper lobe mass, which was compatible with progressive massive fibrosis and was relatively stable in appearance over the past eight months. There was a slight decrease in inflammation of the perihilar regions, as compared with a prior study. There were no changes which were suggestive of malignancy (R. 305).

Dr. Pondo assessed Plaintiff on January 15, 2004, and found his neck supple, chest clear to auscultation, and extremities without clubbing, cyanosis, edema. Plaintiff was neurologically non focal. Dr. Pondo diagnosed pneumoconiosis and massive fibrosis (R. 304).

On January 29, 2004, Plaintiff underwent a treadmill stress test. He was tested at two miles per hour and achieved his target heart rate. Plaintiff tolerated the test well, without complications. Plaintiff's post-test readings were as follows: pH7.38; pCO2 36; pO2 57; HCO3 20, B.E. –3.6, and O2 Sat. 89 (R. 100, 529).

Also on January 29, 2004, Plaintiff underwent a pulmonary function study at Chest Medical Services. His pre-drug spirometry scores ranged from sixty-five to ninety-eight percent of predicted value (R. 109, 539).

On February 11, 2004, Dr. Sharp wrote to the West Virginia Workers' Compensa-

tion Division, requesting authorization for Plaintiff to be treated for bronchitis and pneumonia. Dr. Sharp wrote that Plaintiff's experienced coughing, shortness of breath, and congestion. His examination revealed reduced breath sounds in his lungs, and the chest x-ray "revealed an infiltrate in the left lower and mid base." Dr. Sharp reported he had injected Plaintiff with Claforan, DepoMedrol, and Vitamin B12 and prescribed Avelox. Dr. Sharp referred Plaintiff to Dr. Pondo for further evaluations (R. 353, 502).

On February 16, 2004, Dr. Pondo diagnosed Plaintiff with pneumoconiosis. His chest was positive for wheezes (R. 303).

Also on February 16, 2004, Sharon Joseph, Ph.D., completed a Neuropsychological Screening Profile of Plaintiff. Plaintiff reported he had a back injury, Black Lung disease, and a neck injury. He reported migraine headaches and memory loss. Plaintiff listed his prescriptions as Albuterol, Singulair, Ipratropium Bromide, Vioxx, Tizanidine, Alprazolam, Lorcet, and Percocet (R. 298). Plaintiff stated he did not use tobacco and drank alcohol rarely. Plaintiff had never been treated for an emotional or psychological problem. Plaintiff informed Dr. Joseph he was being treated by Dr. Brick, a neurologist (R. 299).

Plaintiff's Verbal IQ was 75; Performance IQ was 80; and Full Scale IQ was 75. He was found to be in the Borderline Range of Intellectual Functioning (R. 299). Plaintiff was alert and oriented times three. Plaintiff reported difficulty sleeping, mild depression, and poor appetite. Plaintiff denied suicidal or homicidal ideations, hallucinations, delusions, preoccupations, obsessions, or compulsions. Dr. Joseph noted Plaintiff displayed no "obvious physical limitations relative to dexterity, ambulation, or speech." Plaintiff's motor activity was calm, posture was appropriate, eye contact and language were average, and speed of speaking was normal. Dr. Joseph found Plaintiff's immediate and remote memory to be normal and his recent memory to be mildly impaired. Plaintiff's judgment was found to be moderately impaired and his concentration was found to be mildly impaired (R. 300).

Plaintiff reported his activities of daily living were as follows: awoke at 9:00 a.m., drank coffee, watched television, ate dinner, and retired at 11:00 p.m. Plaintiff stated he would attempt to go outside in the afternoons, but that activity depended on the weather. Plaintiff could make his bed, dust, cook a meal, put away groceries, take out the garbage, walk to the mailbox, go grocery shopping, drive a car, and manage his finances. Plaintiff stated he could remember to turn off the stove. Plaintiff was unable to go up and down stairs well. Plaintiff stated he could "fish a little" and he enjoyed playing cards. Plaintiff's socialization was considered to be within normal limits. Dr. Joseph found the following diagnostic impressions: Axis I—adjustment disorder with depressed mood; Axis II—Borderline Intellectual Functioning; and Axis III—back injury, neck injury, Black Lung, history of testicular cancer, migraine headaches (all per Plaintiff's report). Dr. Joseph found Plaintiff's psychological prognosis was fair and he could manage benefits (R. 301).

On February 18, 2004, Dr. Sharp corresponded with West Virginia Workers' Compensation Division, requesting authorization for Lorcet, Vioxx, Zanaflex, and Xanax for Plaintiff. Dr. Sharp wrote that Plaintiff's pain was "9/10 without pain medication, and 4/10 with pain medication." Dr. Sharp also wrote that it was his opinion that Plaintiff should undergo a pain management consultation to determine if any treatment should be taken to relieve Plaintiff's pain and chronic muscle spasms (R. 354).

In a separate letter to West Virginia Workers' Compensation, dated February 18, 2004, Dr. Sharp requested approval for Singulair, Albuterol, and Zithromax for Plaintiff. Dr. Sharp reported Plaintiff continued to cough. Dr. Sharp wrote that Dr. Gaziano had recommended that Plaintiff be evaluated for a "mass/density that was seen in his lungs" (R. 352, 506).

On March 15, 2004, Plaintiff presented to Dr. Pondo with no cough and no fever. His neck was supple and his chest was clear to auscultation. Plaintiff's respiratory system was stable and Dr. Pondo noted he would observe Plaintiff "off r/x" (R. 302).

On June 2, 2004, a state agency physician completed a Physical Residual Functional Capacity Assessment of Plaintiff. The physician found Plaintiff could occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk for six hours in an eight hour work day, sit for a total of six hours in an eight hour workday, and push/pull unlimited (R. 322). Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 323). It was determined that Plaintiff had no manipulative, visual or communicative limitations (R. 324–25). Plaintiff was unlimited in his exposure to extreme cold and heat, wetness, humidity, noise, and vibration. The state agency physician opined Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and hazards (R. 325). The state agency physician reduced Plaintiff's RFC to light work (R. 326).

On June 4, 2004, Rosemary K. Smith, Ph.D., completed a Psychiatric Review Technique of Plaintiff. She found Plaintiff had an organic mental disorder (borderline functioning) and affective disorder (adjustment disorder) (R. 329, 330, 332). She found Plaintiff was mildly limited in his activities of daily living, moderately re-stricted in his ability to maintain social functioning, and mildly limited in his ability to maintain concentration, persistence, and pace. Dr. Smith found Plaintiff had not experienced episodes of decompensation (R. 339). She opined Plaintiff did not meet the "C" criteria of the Listings (R. 340).

Also on June 4, 2004, Dr. Smith completed a Mental Residual Functional Capacity Assessment of Plaintiff. She found Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or in his ability to remember and understand very short and simple instructions. Dr. Smith found Plaintiff was moderately limited in his ability to understand and remember detailed instructions (R. 343). Plaintiff was found not to be significantly limited in his ability to carry out very short and simple instructions; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual; ability to sustain an ordinary routine without special supervision; ability to work in coordination with or proximity to others without being distracted by them; ability to make simple work-related decisions; and ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 343–44). Plaintiff's ability to carry out detailed instructions was found to be moderately limited (R. 343). Dr. Smith found Plaintiff's ability to interact appropriately with the general public to be moderately limited. She found his abilities to ask simple questions, request assistance, accept instruction, respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or being distracted by them, maintain socially appropriate behavior, and

adhere to basic standards of neatness and cleanliness were not significantly limited. Dr. Smith found Plaintiff was not significantly limited in his abilities to respond appropriately to changes in the work setting, be aware of normal hazards, take appropriate precautions, travel in unfamiliar places, use public transportation, set realistic goals, or make plans independently of others (R. 344). Dr. Smith opined Plaintiff would be "able to learn and perform simple, unskilled worklike activities" (R. 345).

On June 9, 2004, Joseph J. Renn, III, M.D., F.C.C.P., reported his findings relative to the independent medical evaluation he performed on Plaintiff on May 19, 2004. Plaintiff reported to Dr. Renn that he had exertional dyspnea when walking and climbing stairs, but not when he was involved with activities of daily living, such as eating, shaving, bathing, and dressing/undressing. Plaintiff stated he had a cough two to three days per week, which produced sputum (R. 117, 545). Plaintiff stated he gasped for breath with overexertion, had pneumonia on four occasions, and had hypertension since 2000. Plaintiff reported he did not have wheezing, paroxysmal nocturnal dyspnea, orthopnea, edema, palpitations, extra heartbeats, skipped heartbeats, angina pectoris, cardiac murmur, myocardial infarction, congestive heart failure, allergic rhinitis, asthma, emphysema, bronchitis, or pleurisy. Plaintiff stated he had rubbed snuff from 1995 to 2001; he consumed two alcohol drinks per month; and he did not consume illegal drugs. Plaintiff treated his conditions with Singulair, Hydroco/APAP, Alprazolam, Tizanidine, Albuterol inhaler, and Albuterol and Ipratropium nebulizers (R. 118, 546).

Plaintiff stated he no longer wood worked, but he continued to fish and hunt (R. 118, 546). Plaintiff occasionally walked short distances for regular exercises. His usual activities were shopping with his wife, reading the newspaper, doing "some" yard work, and watching television (R. 119, 547).

Plaintiff's examination revealed he was in no acute distress; his cardiac exam showed no thrills, gallops, or murmurs; his lungs were clear to palpation, percussion, and auscultation; and there were no jugular venous distention, hepatojugular reflux, hepatomegaly, cyanosis, clubbing, or edema. Plaintiff's electrocardiograph was normal (R. 119, 547). Plaintiff's chest radiograph showed category "C" complicated pneumoconiosis and no other abnormalities. Plaintiff's spirometry, lung volumes, and resting arterial blood gases were normal. Plaintiff's diffusing capacity was moderately reduced, but it partially corrected toward normal when the alveolar volume was considered. Dr. Renn diagnosed "simple coalworkers' pneumoconiosis"; "complicated coalworkers' pneumoconiosis"; and "moderate diffusion abnormality" (R. 120, 548). Dr. Renn opined Plaintiff should not return to any type of "work where he [would be] exposed to coal mine dust owing to the presence of complicated coalworkers' pneumoconiosis" and that he was "totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis." Dr. Renn also found, based on a review of Plaintiff's medical records, that he was incapable of performing heavy manual labor for extended periods of time due to his exercise-induced hypoxemia (R. 121, 549).

On August 23, 2004, Plaintiff was awarded benefits by the U.S. Department of Labor, under the Black Lung Act, for pneumoconiosis (R. 67–70).

On October 14, 2004, Plaintiff underwent a resting pulmonary function study at the Occupational Lung Center for the West Virginia Occupational Pneumoconiosis

Board. The exercise component of this test was not administered due to back pain. His spirometry score ranged from 73% to 95% of the predicted value, pre-bronchodilator, and 79% to 95% of the predicted value, post-bronchodilator. Plaintiff's diffusion score ranged from 56% to 80% of the predicted value, pre-bronchodilator, and 57% to 85% of the predicted value, post-bronchodilator (R. 145).

On December 1, 2004, Plaintiff was awarded 65% disability from the West Virginia Workers' Compensation Commission for occupational pneumoconiosis (R. 143).

On January 25, 2005, Dr. Sharp wrote a letter to Plaintiff's counsel, noting therein that Plaintiff could not walk three-hundred feet on a level surface at a slow pace and, if he were to carry ten pounds, his distance would be reduced to 150 to two-hundred feet. Plaintiff could walk fifty feet uphill, and, if he were to carry ten pounds or a gun, he could walk only 15 to twenty feet without resting. Dr. Sharp wrote that Plaintiff's neck and right arm pain prevented him from fly-fishing, but that he might be able to "sit by the lake with a cane pole" and fish. Dr. Sharp noted Plaintiff was unable to perform all of his activities of daily living and his parental obligations (R. 346). Dr. Sharp wrote Plaintiff was "unable to sit and drive over 15 miles without changing positions and stopping." Dr. Sharp opined "[t]here [was] no unskilled sedentary type work, ... any where [sic] within an hours [sic] drive of his home" and he "doubt[ed] that [Plaintiff] [was] capable of maintaining any type of unskilled, sedentary job" (R. 347).

Also on January 25, 2005, Dr. Sharp completed a Medical Assessment of Ability to do Work–Related Activities (Physical) of Plaintiff. Dr. Sharp opined Plaintiff's ability to lift and/or carry was affected by his impairment in that he could not bend, lift or squat; could lift ten to twenty pounds for "5 minutes max"; and was unable to carry. Plaintiff's standing/walking was affected by his COPD, "very limited lung capacity," and pneumoconiosis (R. 348). Dr. Sharp found Plaintiff could walk ten minutes without interruption and for less than thirty minutes total. Dr. Sharp opined Plaintiff could sit ten minutes without interruption and for a total of two hours per day. Plaintiff could never climb, balance, stoop, and crouch. Plaintiff could occasionally kneel, crawl, and push/pull. Dr. Sharp found Plaintiff was limited in reaching in all directions and gross manipulation with his right arm and hand, but had no other manipulative limitations (R. 349). Dr. Sharp opined Plaintiff had visual limitations without glasses, but no visual limitations when he wore his glasses. Dr. Sharp found Plaintiff's environmental restrictions included heights, moving machinery, temperature extremes, chemicals, and dust (R. 350).

On January 27, 2005, Mohamed Fahim, M.D., of the Pain Management Clinic at Davis Memorial Hospital, examined Plaintiff upon referral from Dr. Sharp. Plaintiff reported difficulty sleeping, neck and back pain, headaches, left leg weakness, and depression. Upon examination, Dr. Fahim found Plaintiff had no thyromegaly; had regular cardiovascular rate and rhythm; had clear lungs to auscultation, bilaterally; had soft and tender abdomen; had no edema in extremities; had steady and normal gait; could walk on tiptoes and heels; had intact cranial nerves; had intact and normal motor power in upper and lower extremities, bilaterally; had intact and normal sensations in the upper and lower extremities; and had intact reflexes. Dr. Fahim found Plaintiff had decreased range of motion in his neck; tenderness over the cervical facet joints, bilaterally; a straight leg test that was fifty degrees, bilaterally; a positive Patrick's test, bilaterally; tenderness over both the lumbar facet joints on both sides; and tenderness

over both sacroiliac joints. Dr. Fahim opined that Plaintiff's response "to the examination was exaggerated" (R. 469).

Dr. Fahim reviewed several of Plaintiff's diagnostic tests and offered the following opinions:

- April 21, 2001, MRI of lumbar spine showed degenerative disc disease, particularly affecting lower two or three lumbar vertebral levels as well as T12–L1 and L1–2, neural foraminal encroachment, no evidence for spinal canal stenosis, no definite nerve root impingement, and effacement inferiorly at L4–5, bilaterally;

- August 3, 2001, MRI of lumbar spine showed minimal diffuse disc bulge at L3–4, without significant mass effect, broad based disc bulge at L4–5, with minimal bilateral recess stenosis, and evidence of artherosclerotic change in the aorta;

- October 26, 2001, dynamic motion x-ray of lumbar spine showed minimal osteoarthritis, narrowing of L1–L2 disc space, and restricted motion on lateral bending to right;

- March 18, 2002, MRI of lumbar spine showed mild degenerative disc disease and tiny central protrusions noted at T12–L1 and L1–2;

- March 18, 2002, plain x-ray of lumbar spine showed mild degenerative changes; and

- June 3, 2002, lumbar spine CT scan and lumbar myelogram CT showed mild diffuse disc bulge at L4–5 without significant mass effect and mild disc bulge at L5–S1 without significant mass effect (R. 469).

Dr. Fahim diagnosed bilateral lumbar facet joint disease, bilateral sacroiliac joint disease, bilateral cervical facet joint disease, degenerative disc disease of the lumbar spine, myofascial pain syndrome of the upper and lower back, Black Lung disease, headaches, and multiple pain complaints, including lower back pain, neck pain, and bilateral lower extremity pain (R. 469). Dr. Fahim continued Plaintiff on the medications prescribed by Dr. Sharp, referred Plaintiff to Dr. Sharon Joseph for a psychological evaluation, and scheduled Plaintiff for left lumbar facet joint injections, right lumbar facet joint injections, left sacroiliac joint injections, right sacroiliac joint injections, right cervical facet joint injections, and left cervical facet joint injections. Dr. Fahim noted if Plaintiff's pain continued after the above listed series of injections, he would treat Plaintiff with lumbar epidural steroid injections (R. 470).

On March 23, 2005, Dr. Sharp corresponded with Plaintiff's counsel, informing her that Plaintiff had been diagnosed with occupational pneumoconiosis with total pulmonary function impairment by the Occupational Pneumoconiosis Board. Dr. Sharp also wrote that Plaintiff did not complete his exercise tolerance testing, administered on July 24, 2003, and October 14, 2004, by the Occupational Pneumoconiosis Board because of heart disease during the first exam and back pain during the second exam (R. 474, 475, 477).

On April 21, 2005, Dr. Sharp corresponded with Plaintiff's counsel, informing her that Plaintiff had been referred to Dr. Fahim, at the Pain Management Clinic, who had continued Plaintiff on Lorcet, Xanax, Zanaflex, Vioxx and/or Celebrex and had been giving Plaintiff trigger injections. He opined Plaintiff's pain was chronic and progressive (R. 467).

On May 19, 2005, Arturo Sabio, M.D., completed a consultative examination of Plaintiff for the West Virginia Disability Determination Service. Dr. Sabio reviewed the following of Plaintiff's medical records:

- March 19, 2002, lumbar MRI, which showed mild degenerative disc disease

of the T12 and L1, L1 and L2 inter-spaces;

- June 3, 2002, lumbar myelogram, which showed minimal anterior epidural impression of the L3–L4 and L4–L5 interspaces;
- June 3, 2002, lumbar spine CT scan, which showed mild diffuse disc bulge at L4–5 and L5–1 interspace and no mass effect;
- December 19, 2003, chest CT scan, which showed bilateral upper lob mass compatible with progressive muscle fibrosis and no evidence of malignancy;
- Dr. Pondo's consultations notes, dated May 9 and July 11, 2003, diagnosing Plaintiff with pneumoconiosis;
- April 22, 2003, bronchoscopy results, which showed no interbronchial lesions, but inflammatory changes; and
- Results from the specimen from the bronchial washing and bronchial biopsy, which showed fibrosis, chronic inflammation, and foreign material consistent with anthracosis and silicosis (R. 479–80).

Plaintiff informed Dr. Sabio that he had shortness of breath for six years and could ambulate for one-hundred yards on level ground. Plaintiff stated he could walk up an incline for 15 yards before having to "stop to catch his breath." Plaintiff was able to walk up four steps and then had to stop because of breathlessness. Plaintiff had chronic cough and frequent wheezing and used a nebulizer and inhaler, but not oxygen. Plaintiff stated he had low back pain since 2000 due to an injury he received while pulling a miner cable. Plaintiff described his symptoms as sharp pain, which radiated to his left leg; numbness from the front of the right thigh down to his knee; numbness in his toes; left leg giving out; constant aching in lumbar spine, without radiation; increased pain with repetitive bending, heavy lifting, and sitting for more than one hour; severe pain after riding in a car for more than one hour, for which he had to "step out and stretch his back"; and ambulation and weight bearing for twenty minutes increased back pain. Plaintiff stated he was told he had arthritic spurs in his spine. He informed Dr. Sabio that he had been prescribed physical therapy, but it worsened his pain. Plaintiff stated the epidural injections he received at the pain clinic did not lessen his pain (R. 480).

Plaintiff denied any cardiovascular, gastrointestinal, genitourinary, or neurological abnormalities. Dr. Sabio found Plaintiff to be alert and oriented as to time, place, and person and that he ambulated with a normal gait and was stable at station. Plaintiff did not lurch. Plaintiff's respiration was "22 per minute and unlabored" (R. 481). Plaintiff's HEENT, neck, abdomen, and cardiovascular examinations were normal (R. 481–82). Plaintiff's chest examination revealed rhonchi all over, sighing breaths, frequent dry cough, but no rales, wheezing or cyanosis (R. 482).

Dr. Sabio's examination of Plaintiff's extremities revealed no tenderness, redness, effusion, swelling, heat, or signs of inflammation of his shoulders, elbows, wrists, or hands. There were no Heberden notes, Bouchard nodes, or rheumatoid nodules found. There was no tenderness, redness, effusion, or signs of inflammation in Plaintiff's hips, knees, or ankles. Plaintiff's femoral pulses were 2/2, symmetrical, and without bruits. His dorsalis pedis and posterior tibial arteries had strong and symmetrical pulses. Plaintiff's muscle development was symmetrical, bilaterally. He had no venous insufficiency, varicose veins, stasis ulcers, clubbing, or cyanosis (R. 482).

Plaintiff had tenderness over the second and third thoracic vertebrae and L5–S1, second, and third lumbar vertebrae. He had no kyphosis or scoliosis. Plain-

tiff's cervical spine range of motion was sixty degrees of flexion; 75 degrees of extension; 45 degrees lateral flexion, bilaterally; and eighty degrees rotation, bilaterally. Plaintiff's shoulder abduction was 180 degrees, bilaterally; forward flexion was 189 degrees, bilaterally; adduction was fifty degrees, bilaterally; internal rotation was forty degrees, bilaterally; and external rotation was ninety degrees, bilaterally. Plaintiff's elbow flexion was 150 degrees, bilaterally; extension was zero degrees, bilaterally; supination was eighty degrees, bilaterally; and pronation was eighty degrees, bilaterally. Plaintiff's wrist dorsiflexion was sixty degrees, bilaterally; palmar flexion was seventy degrees, bilaterally; radial deviation was twenty degrees, bilaterally; and ulnar deviation was thirty degrees, bilaterally. All Plaintiff's hand joints allowed ninety degrees of flexion and zero degrees of extension. Plaintiff's straight leg raising test was 45 degrees, bilaterally, and was restricted due to complaints of pain in the lumbar spine. Plaintiff's lumbar flexion was thirty degrees forward and ten degrees laterally to either side. Plaintiff refused to "go any further" due to complaints of pain and stiffness. Plaintiff's hips had one-hundred degrees of flexion and thirty degrees of extension, bilaterally (R. 482). Plaintiff's knees had 150 degrees of flexion and zero degrees extension, bilaterally (R. 482–83). Plaintiff's ankles had twenty degrees of dorsiflexion and forty degrees of plantar extension, bilaterally (R. 483).

Plaintiff's neurologic examination revealed grossly intact cranial nerves, intact sensory function to light touch, intact pinprick, and 5/5 bilateral motor strength in upper and lower extremities. Plaintiff's deep tendon reflexes and Babinski reflexes were normal. Plaintiff could walk on his heels, on his toes, and heel-to-toe in tandem. Plaintiff could stand on either leg separately and could squat fully. Plain-

tiff's fine manipulation movements were normal (R. 483).

Dr. Sabio diagnosed Plaintiff with Black Lung pneumoconiosis (by history) and degenerative disk disease of the lumbar spine (R. 483).

Also on May 19, 2005, Dr. Sabio completed a Medical Source Statement of Ability to do Work–Related Activities (Physical) of Plaintiff. He found that Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for at least two hours in an eight-hour workday; and had limited pushing and/or pulling in his lower extremities (R. 485–86). Dr. Sabio did not offer an opinion as to Plaintiff's ability to sit. Dr. Sabio found Plaintiff should never climb; could occasionally crouch, crawl, and stoop; and could frequently balance and kneel (R. 486). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 487). Dr. Sabio found, due to Plaintiff's breathing, that he should limit his exposure to dust, fumes, odors, chemicals, and gases, but not to temperature extremes, vibrations, humidity, wetness, and hazards (R. 488)

On May 19, 2005, Plaintiff underwent a ventilatory function test at Tri–State Occupational Medicine. Plaintiff's effort was good. The pulmonary function study was normal (R. 489–90).

On June 30, 2005, Dr. Sharp completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds or less; frequently lift and/or carry ten pounds or less; stand and/or walk for at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour work day and must periodically alternate sitting and standing to relieve pain or discomfort; and push/pull was limited in his lower extremities (R. 492). Dr. Sharp found Plaintiff was occa-

sionally limited in his ability to climb ramps and stairs, balance, kneel, and crawl and could never climb ladders, ropes, scaffolds, stoop, or crouch (R. 493). Dr. Sharp found Plaintiff had no manipulative or visual limitations (R. 494). Plaintiff's communicative limitation was noted as a one percent hearing loss. Dr. Sharp found Plaintiff's exposure to noise and vibrations could be unlimited; he should avoid concentrated exposure to extreme cold and heat; he should avoid moderate exposure to wetness, humidity or hazards; and he should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation (R. 495).

Dr. Sharp noted Plaintiff had pneumoconiosis, which was progressive, which caused a chronic cough, and for which he would be under the constant care of a pulmonologist. Dr. Sharp also noted Plaintiff had injuries to his lumbar, cervical, and thoracic spine, which limited his physical abilities to lift, carry, and bend. Dr. Sharp found Plaintiff would be capable of sedentary work, with limitations, "under the optimal conditions. Not Pocahontas County" (R. 498).

*Administrative Hearing*

Plaintiff testified at the administrative hearing that Dr. Sharp had treated his low back condition with electrical stimulation and trigger point injections. He stated that Dr. Sharp had referred him to surgeons, but none had recommended surgery (R. 629). Plaintiff testified the trigger point injections administered by Dr. McClung "helped for a little while" and the "trigger point [injections] to block the nerve" administered by Dr. Fahim did not alleviate his pain (R. 630). Plaintiff stated the medications prescribed by Dr. Sharp for the treatment of his back pain "help[ed] a good bit." Plaintiff stated without the medication, his pain was an eight or nine on a scale of one-to-ten and a five on that scale with the pain medication. Plaintiff testified his pain was "[f]rom [his] neck clear to [his] feet" (R. 631). Plaintiff stated his pain occurred daily and that he sometimes experienced chest pain. Plaintiff stated his pain was exacerbated by over exerting himself, lifting, or walking too much. Plaintiff testified he could walk 15 yards uphill and one-hundred yards on a level surface, then he suffered severe chest and leg pain. Plaintiff stated he could stand for no more than ten or 15 minutes at a time, then his legs went numb. Plaintiff testified he had not lifted anything over ten pounds since the time of his back injury (R. 632). Plaintiff stated he rarely sat; instead, he lay down "the biggest part of the time" with ice or heat on his back. Plaintiff testified that driving, reaching, or holding the steering wheel caused severe neck pain (R. 633). Plaintiff stated he "very often" had muscle spasms, which he treated with a TENS unit, ice packs and heating pad (R. 634). Plaintiff testified he used a nebulizer machine four times a day for 15 to twenty minutes each time for treatment of his Black Lung disease (R. 635). Plaintiff stated his breathing was worsened by pollen, cold weather, dust, and cigarette smoke, exhaust, smoke, diesel fuel smoke, and perfumes (R. 636). Plaintiff testified his leg had "gotten worse" during the "past year" because pain "went clear to" his toes and they went numb (R. 639).

Plaintiff testified that he had difficulty sleeping in that he was up "at least an hour and half, two hours every, on the hour til about six o'clock." He stated he slept best from 6:00 a.m. to 9:00 a.m., that sometimes he slept on the floor or couch, and that he was sleepy throughout the day due to medications, but he did not nap (R. 638). Plaintiff stated he watched television, read the paper, went outside, walked his dog in the yard, and sometimes helped his wife with light duty work around the house, such as vacuuming with a small vacuum cleaner and washing dinner dishes

(R. 639). Plaintiff testified he could shop for ten or 15 minutes before he had to sit. Plaintiff testified that he no longer hunted, fished, or did woodworking (R. 637). Plaintiff stated he had difficulty hearing when he watched television or when several people were talking in one room (R. 638). Plaintiff stated he "hunt[ed] a little bit" on his own property, which contained 4.3 acres. Plaintiff also stated he fished "a little" and had to be accompanied by another because "of falling" (R. 640).

Vicki Shinaberry, Plaintiff's wife, testified at the administrative hearing that Plaintiff did not visit friends; no longer hunted or fished; and did not woodwork or "tinker with automobiles." Mrs. Shinaberry stated Plaintiff would accompany her to her small kitchen garden and pick a few vegetables (R. 643). Mrs. Shinaberry testified Plaintiff was depressed. She stated Plaintiff loved his former job and would still be working if he were capable (R. 643–44). Mrs. Shinaberry testified their twenty-nine year old son helped her with chores "around the house that his dad [was] not able to do," such as performing yard work and weeding on his days off from work. She stated that her son and a friend split firewood for her and Plaintiff (R. 642).

The ALJ asked VE James Pearis the following hypothetical question: "Please assume you are dealing with an individual the same age as the claimant who has the same educational background and past work experience. Further assume that the claimant retains residual functional capacity for sedentary work, with the following additional limitations. Standing at least two hours, push-pull limited in the lower extremities, no ladders, ropes, scaffolds, stooping, or crouching, occasional climbing stairs, ramps, balancing, kneeling and crawling, avoid even moderate exposure to hazards or wetness or humidity. And avoid concentrated exposure to extreme cold or heat Could this individual perform any . . . job that exists in the local, regional, or national economy?" (R. 647). The VE testified that such an individual could perform various jobs at the sedentary, unskilled level; specifically, assembly jobs, surveillance system monitor jobs, and general office clerk jobs (R. 647–48).

*Evidence Submitted During Hearing*

On April 22, 2003, the results of Plaintiff's washing of his right upper lung lobe showed bronchial cells and inflammatory cells and was negative for malignancy (R. 538) (This evidence was included in the record prior to the hearing. See p. 312.)

On February 9, 2004, Dr. Carl B. Burns, completed a Reontgenographic Quality Reread of Plaintiff's January 29, 2004, x-ray for the U.S. Department of Labor. Dr. Burns commented that "med[ium] & upper lung densities may be large opacities, cannot r/o other pathology, including neoplasm." Dr. Burns recommended Plaintiff should see his personal physician (R. 535).

On May 19, 2004, Dr. Renn opined, in a Pulmonary Function Report, that Plaintiff's carboxyhemoglobin level was normal (R. 555).

Plaintiff presented to Dr. Sharp on February 2, 9, and 16, 2005, for treatment of his symptoms with a TENS unit, hot pack, OMT, and ultrasound therapy. On February 2, 2005, Plaintiff complained of lower back pain; on February 9, 2005, Plaintiff complained of ongoing neck pain, headaches, arm numbness, and low back pain; on February 16, 2005, Plaintiff complained of neck pain, headaches, arm numbness, and low back pain (R. 598–600).

On February 22, 2005, Plaintiff presented to Dr. Sharp with a productive cough and a "sore" chest. Dr. Sharp prescribed Albuterol, Singulair, and Ipratropium (R. 597). Plaintiff informed Dr. Sharp that he experienced continued lower back pain.

He was treated with a TENS unit, hot pack, and ultrasound therapy. Dr. Sharp discussed Plaintiff getting treatment at the pain clinic and prescribed Lorcet, Xanax, Zanaflex, and Diclofenac (R. 596).

On March 2, 2005, Plaintiff was treated by David W. Plank, Dr. Sharp's Physician's Assistant, for pneumoconiosis. He was prescribed Accuneb, Lorcet, Singulair, Advair, Xanax, and Zanaflex (R. 595). Plaintiff was treated for lower back pain, neck pain, and headaches with TENS unit, hot pack OMT., and ultrasound therapy (R. 594).

On March 9 and 17, 2005, Plaintiff reported low back pain to Dr. Sharp. He was treated with TENS unit, hot pack, and ultrasound therapy on March 9, 2005 (R. 592–93).

On March 22, 2005, Plaintiff returned to Dr. Sharp with complaints of a dry cough. Dr. Sharp prescribed Ipratropium, Albuterol, and Singulair (R. 591).

On March 24, 2005, Plaintiff presented to Dr. Sharp with complaints of continued low back pain. He reported he had received four facet injections on March 23, 2005, which reduced the pain in both legs and groin. Plaintiff reported he had been driving "a lot to Elkins." Plaintiff stated his neck pain and occurrence of headaches had increased. Dr. Sharp treated Plaintiff with a TENS unit and ultrasound therapy; he prescribed Lorcet and Xanax (R. 590).

On March 29, 2005, Plaintiff reported to Dr. Sharp that he experienced continued lower back pain. Workers' Compensation denied payment for Plaintiff's pain medications. Plaintiff complained of rectal bleeding; Dr. Sharp ordered Plaintiff undergo a rectal/intestinal scope. Plaintiff stated he was depressed and he had an appointment with a psychiatrist on that date (R. 589).

On April 6, 2005, Plaintiff reported he ceased taking Diclofenac and his rectal bleeding had stopped. Plaintiff stated he experienced a burning sensation in his left leg (R. 587).

On April 21, 2005, Plaintiff reported to Dr. Sharp that he experienced continued back pain. Plaintiff stated he could "do nothing after [he had] shots." Plaintiff told Dr. Sharp that his "groin [was] 'on fire'" and that sensation was "worse after shots," but that Dr. Fahim had told him this condition was "not from shots." Plaintiff stated the pain was worse in his left leg and his toes went numb. Dr. Sharp prescribed Xanax and Lorcet. He treated Plaintiff with TENS unit and ultrasound therapy (R. 585).

On April 27 and May 4, 2005, Plaintiff was treated with TENS unit and ultrasound therapy by Dr. Sharp for his low back pain (R. 582–83).

On May 11, 2005, Plaintiff was treated by Dr. Sharp for a cough. He was prescribed Nasonex and Levaquin and a chest x-ray was ordered for Plaintiff (R. 580).

On May 24, 2005, Plaintiff presented to Dr. Sharp with complaints of low back pain that radiated to his left groin area and left leg. Dr. Sharp prescribed Accuneb, Lorcet, Singular, Advair, Xanax, and Zanaflex (R. 578–79).

On May 31, 2005, Plaintiff returned to Dr. Sharp with a chronic, productive cough. Dr. Sharp ordered a chest x-ray (R. 575–76).

On June 21, 2005, Plaintiff informed Dr. Sharp that his "scrotum [was] 'on fire'" and that it "'burn[ed] all the time.'" Plaintiff stated Workers' Compensation would not pay for his medications. Dr. Sharp prescribed Lorcet, Xanax, Zanaflex, Singulair, and Albuterol (R. 574).

On July 19, 2005, Dr. Sharp examined Plaintiff and reported Plaintiff was positive for mild wheezing, dyspnea, cough, and snoring; headaches; unsteady gait; and

anxiousness, depressed mood, and irritability. Dr. Sharp noted Plaintiff's lumbar spine had muscle spasm with severe pain. Plaintiff was alert and oriented times three; his intellect was grossly normal; his memory was intact; his cranial nerves were grossly intact; he had no sensory, motor, or coordination loss; his balance and gait were intact; and his fine motor skills were normal (R. 571). Plaintiff's reflexes were normal. Dr. Sharp opined Plaintiff was anxious, had a depressed affect, had mood swings, and was agitated, but that Plaintiff had normal insight, normal judgment, no suicidal ideations, no hyperactivity, no compulsive behaviors, no obsessive thoughts, no hallucinations, and no paranoia. Dr. Sharp noted he had recommended back exercises and a walking program and had prescribed medication to Plaintiff (R. 572).

*Evidence Received After Hearing*

On August 23, 2005, Rafael Gomez, M.D., completed a medical consultant's case analysis of Plaintiff. He reviewed Plaintiff's January 29, 2004, pulmonary function test and opined that Plaintiff's arterial blood gas $pO_2$ was 84 resting and his arterial blood gas $pCO_2$ was 33 resting, which did not meet a Listing. Dr. Gomez opined he was unable to determine if Plaintiff's arterial blood gas for $pCO_2$ of 36 with exercise and his arterial blood gas for $pO_2$ of 56 with exercise met a Listing because the report under review by him did "not give for how long patient exercised" and the Listing "call[ed] for 5 METs of exercise." Dr. Gomez also reviewed Plaintiff's May 19, 2004 pulmonary function study and opined he did not meet a Listing based on his pre- or post-medicated trials or his diffusion capacity for carbon monoxide (R. 604).

In a letter addressed to the ALJ and dated August 30, 2005, Plaintiff's lawyer commented on the opinion expressed in Dr. Gomez's opinion that Plaintiff did not meet a Listing because the length of time Plaintiff exercised was not contained in the record. Plaintiff's counsel argued that the language in SSR Listing 3.02(C)(3) mandates there should be a "steady state of exercise with a level of exercise equivalent to less than five (5) METS" and that Plaintiff should meet the Listing because he was tested on a "treadmill, at two (2) mph and the exercise was stopped due to target heart rate [having been] achieved. It is therefore quite reasonable to accept that exercise was done at less than five (5) METS ...." and that Plaintiff had "met the listing [sic] a[sic] 3.02(C)(3)" (R. 606).

*Evidence submitted to the Appeals Council*

On December 18, 2006, Plaintiff was awarded a permanent, total disability due to "functional limitations imposed as a direct result of occupational pneumoconiosis" (R. 614–18).

### III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ O'Hara made the following findings:

1. The claimant meets the non-disability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's coal worker's pneumoconiosis and degenerative disc disease of the lumbosacral spine are considered "severe" based on

the requirements in the Regulations at 20 CFR § 404.1520(c).

4. These medically determinable impairments do not meet of medically equal the requirements of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

6. The claimant retains the residual functional capacity for work at the sedentary exertional level that may require standing for at least two hours out of eight with limited pushing/pulling in the lower extremities; no climbing of ladders, ropes or scaffolds; no stooping or crouching; no more than occasional climbing of stairs/ramps, balancing, keeling, or crawling; and restricted so as to avoid concentrated exposure to temperature extremes, even moderate exposure to hazards, wetness and humidity, and all exposure to fumes, odors, dusts, gases or poor ventilation.

7. The claimant is unable to perform any of his past relevant work (20 CFR § 404.1565).

8. The claimant is a "younger individual" (20 CFR § 404.1563).

9. The claimant has "a limited education" (20 CFR § 404.1564).

10. The claimant has no transferable skills from any past relevant work (20 CFR § 404.1568).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 CFR § 404.1567).

12. Although the claimant's exertional limitations do not allow him to perform the full range of sedentary work, using Medical–Vocational Rule 201.19 as a framework for decision-making, mere are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as an assembler, a surveillance monitor, and a general office clerk.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(g)) (R. 28–29).

### IV. DISCUSSION

#### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker,* 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays,* 907 F.2d at 1456 (*quoting Laws v. Cele-*

*brezze,* 368 F.2d 640, 642 (4th Cir.1966)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir.1987).

### B.   Contentions of the Parties

Plaintiff contends:

1.  The ALJ incorrectly evaluated the claimant's symptoms including pain as is required under 20 C.F.R Section 404.1529 and *Craig v. Chater,* 76 F.3d 585 (4th Cir.1996).

2.  The ALJ erred by not giving great weight to the opinion of the claimant's treating physician, Dr. John Sharp.

3.  The ALJ committed an error of law by substituting his opinion for the unrebutted medical opinions of the State of West Virginia, the United States Department of Labor, the claimant's treating physician and diagnostic blood gas studies, which showed that the claimant's [sic] meets a listing of impairment of 3.02(C)3 Table III–A.

4.  The ALJ improperly relied upon vocational expert testimony where the vocational expert testimony recommended jobs that were outside of the claimant's residual functional capacity.

The Commissioner contends:

1.  The ALJ correctly found Plaintiff's subjective complaints were not entirely credible.

2.  The ALJ correctly found Dr. Sharp's June 30, 2005, assessment was not entitled to great weight.

3.  The ALJ correctly concluded the evidence of record did not support that Plaintiff's pulmonary impairment met the requirements of Listing 3.02(C)(3).

4.  The ALJ properly relied upon the testimony of the vocational expert when finding Plaintiff retained the residual functional capacity to perform a significant number of jobs in the national economy.

### C.   Credibility Analysis

Plaintiff first argues that he ALJ incorrectly evaluated his symptoms including pain as is required under 20 C.F.R Section 404.1529 and *Craig v. Chater,* 76 F.3d 585 (4th Cir.1996). Defendant contends the ALJ correctly found Plaintiff's subjective complaints were not entirely credible. The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler,* 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger,* 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in *Craig v. Chater,* 76 F.3d 585 (4th Cir.1996):

1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers.* The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins,* 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medi-

cal evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster,* 780 F.2d at 1129. . . .

2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated, See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.;* any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

*Craig, supra* at 594. Here, as Plaintiff argues, the ALJ did find Plaintiff met the first, threshold, step, in that he had "coal worker's pneumoconiosis and degenerative disc disease of the lumbosacral spine. Both of these impairments cause significant work-related functional limitations" (R. 25). The ALJ was therefore required to go on to the second step of the evaluation of the intensity and persistence of Plaintiff's pain and the extent to which it limited his ability to work.

A review of the ALJ's decision in this matter shows he did take into account Plaintiff's statements about his pain and limitations, his medical history, medical signs and laboratory findings, objective medical evidence of pain, Plaintiff's daily activities, specific descriptions of the pain, and medical treatment taken to alleviate it. The undersigned finds the ALJ performed the analysis required by the Regulation and *Craig.* Plaintiff, however, argues the ALJ erred: 1) in failing to accept his limitations and the limitations expressed by his treating physician; 2) in incorrectly applying the second step of *Craig* by finding that he seemed to have secondary gain in the form of Workers' Compensation, Exhibits 3D and 6D, and seemed to magnify his limitations; 3) in relying on the statements of Dr. Landis in reaching his opinion that the evidence as a whole established that the severity of the claimant's impairments does not preclude all gainful activity; and 4) in finding that Dr. Renn's report meant "that the claimant was only Totally and Permanently impaired for Workers' Compensation purposes."

The main problem with these arguments are that they compare "apples and oranges," that is, Plaintiff's back impairment and his lung impairment. In 2000, Plaintiff applied for Workers' Compensation after he hurt his back. According to his safety director at work, Plaintiff originally told him he had injured his back lifting a Subaru motor. Plaintiff told his treating physician, Dr. Sharp, that he had hurt his back *either* at work pulling on a mine cable *or at home lifting a motor.* On May 9, 2000, Plaintiff told Dr. Douglas "while pulling a cable at the mines, he began to notice minor low back pain. [He] presumed that he pulled a muscle. He finished work that day, went home and did some additional lifting at home that night. As the week progressed his pain intensified, and he saw Dr. Sharp on April 19, 2000, for increased low back pain and inability to bend over." Later, in a letter to Workers' Compensation, Dr. Sharp stated Plaintiff told him he pulled his back lifting a motor, but continued to work, *then* injured his back pulling

a cable in the coal mine. Even though it does not matter for Social Security purposes how Plaintiff injured his back, the statements attributed to him are inconsistent and appear to indicate, as the ALJ noted, a reason to magnify the gravity of his limitations. Further, as the ALJ noted, Dr. Landis reported that Plaintiff's coal mine closed soon after he stopped working and he therefore had no job to return to.

As the ALJ also noted, Dr. McClung reported that Plaintiff continued to remain active and his pain relief ended when he did some tree trimming, drove a car for two hours, or performed other activities. He "tried to hunt" but "couldn't walk a mile." Dr. Landis found that Plaintiff's range of motion measurements did not pass the validity criteria, and he restricted his range of motion due to subjective pain. Dr. Fahim, the Medical Director of a Pain Management Center, noted that Plaintiff's responses to the examination were exaggerated. Plaintiff was referred to Dr. Fahim by his treating physician in 2005. Dr. Sabio noted that during range of motion testing Defendant "flatly refused to go any further because of pain in the lumbar spine."

The undersigned finds the ALJ followed the requirements of the Regulations and *Craig* when evaluating Defendant's credibility. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir.1984) (*citing Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va.1976)).

Plaintiff is correct that he was found to be totally and permanently impaired by the Office of Workers' Compensation Division of Coal Mine Workers' Compensation. This was totally based on Plaintiff's pneumoconiosis, however, and not on his back impairment. Contrary to Plaintiff's argument, the undersigned agrees with the ALJ that Dr. Renn's determination does not indicate that Plaintiff is totally disabled from all work. This is clear from Dr. Renn's own statement as follows:

> [Plaintiff] should not return to any type of work *where he is exposed to coal mine dust* owing to the presence of complicated coalworkers' pneumoconiosis. He is totally and permanently impaired owing to both simple and complicated coalworkers' pneumoconiosis.... From the medical records, catalogued above, it is evident that he has exercise-induced hypoxemia. He would be unable to perform *heavy manual labor for extended periods of time.*

(R. 549)(emphasis added). Further, in 2004, Dr. Renn reported that Plaintiff used a nebulizer "as needed," and that he had last used it three days earlier. Plaintiff *fished and hunted,* but stopped woodworking. "His usual activities are shopping with his wife, reading the newspaper, *doing some yard work* and watching television." Dr. Renn also noted Plaintiff's spirometry was normal, lung volume was normal, diffusing capacity was moderately reduced but partially corrected toward normal when alveolar volume was considered, and resting arterial blood gases were normal for his age.

Finally, as this Court stated in *Kesling v. Secretary*, 491 F.Supp. 569 (N.D.W.V. 1980):

> The medical evidence of record substantiates the presence of medically determinable physical ailments, but does not necessarily substantiate the degree of severity claimed thereby by Plaintiff. [ FN*]

---

FN* In this regard, the Court notes that Plaintiff has been awarded federal black lung benefits. The only medical evidence of record which would appear to substantiate enti-

tlement to black lung benefits is the results of a single pulmonary function study which result in qualifying values for MVV and FEV1. The Court further recognizes that entitlement to black lung benefits does not necessarily establish total disability under title II of the social Security Act.

Similarly, Social Security Ruling ("SSR") 06–3p provides:

Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by disability decisions by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability made by another agency.

The undersigned also disagrees with Plaintiff's argument that the ALJ erred by relying on Dr. Landis' opinion. First, the ALJ did not "rely" only on Dr. Landis' opinion, but considered a great deal of evidence, including that from Plaintiff's treating physicians. Further, The ALJ was required to consider Dr. Landis' opinion, pursuant to 20 C.F.R. § 404.1527, which states:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the med-

ical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

(ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's

medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability*. The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency*. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

Significantly, Dr. Landis is clearly an examining physician, which entitles his opinion to greater weight. Further, Dr. Landis is an orthopedic surgeon, a specialist, also entitling his opinion to greater weight. During Dr. Landis' examination of Plaintiff, he noted that Plaintiff complained of back pain on all ranges of motion, but was able to sit on the examining table with both legs straight out in front of him and bend forward without having significant increase in back pain. He found this inconsistency significant enough to mention it. Dr. Landis reviewed a great deal of objective medical evidence as well as performing a thorough examination of Plaintiff before diagnosing him with a simple strain/sprain type injury to his lower back superimposed on some mild degenerative changes. He opined that Plaintiff was no longer temporarily totally disabled and "certainly capable of performing at least light to sedentary type work." He noted that Plaintiff's range of motion measurements did not meet the validity criteria, and even then he restricted his range of motion due to subjective pain. Dr. Landis therefore felt it inappropriate to assess impairment using range of motion guidelines, but, because he was required to do so by Workers' Compensation, allowed Plaintiff a 5% whole-man impairment, a very minor percentage.

Dr. Landis' opinion, considering he was not evaluating Plaintiff for his lung impairment, but for his back impairment, is consistent with the record as a whole, and supported by the evidence and his own examination. The undersigned therefore finds the ALJ was entitled to accord Dr. Landis' opinion great weight.

Plaintiff's final arguments in this regard concern Dr. Sharp's opinion and the findings of the Workers' Compensation and Black Lung agencies, which will be discussed separately.

For all the above reasons, the undersigned United States Magistrate Judge finds substantial evidence supports the ALJ's credibility determination.

## D. Treating Physician

Plaintiff next argues that the ALJ erred by not giving great weight to the opinion of the claimant's treating physician, Dr. John Sharp. Defendant contends the ALJ correctly found Dr. Sharp's June 30, 2005, assessment was not entitled to great weight. On June 30, 2005, Dr. Sharp completed a Physical Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff could occasionally lift and/or carry ten pounds or less; frequently lift and/or carry ten pounds or less; stand and/or walk for at least two hours in an eight-hour workday; sit for a total of about six hours in an eight-hour work day and must periodically alternate sitting and standing to relieve pain or discomfort; and push/pull was limited in his lower extremities (R. 492). Dr. Sharp found Plaintiff was occasionally limited in his ability to climb ramps and stairs, balance, kneel, and crawl and could never climb ladders, ropes, scaffolds, stoop, or crouch (R. 493). Dr. Sharp found Plaintiff had no manipulative or visual limitations (R. 494). Plaintiff's communicative limitation was noted as a one

percent hearing loss. Dr. Sharp found Plaintiff's exposure to noise and vibrations could be unlimited; he should avoid concentrated exposure to extreme cold and heat; he should avoid moderate exposure to wetness, humidity or hazards; and he should avoid all exposure to fumes, odors, dusts, gases, and poor ventilation (R. 495). Dr. Sharp ultimately found Plaintiff would be capable of sedentary work, with limitations, "under the optimal conditions. Not Pocahontas County" (R. 498).

The ALJ then found that Plaintiff retained the RFC for work at the sedentary level, with standing for at least two hours out of eight; with limited pushing/pulling of the lower extremities; no climbing of ladders, ropes or scaffolds; no stooping or crouching; no more than occasional climbing of stairs/ramps, balancing, kneeling, or crawling; and restricted him so as to avoid concentrated exposure to temperature extremes, moderate exposure to hazards, wetness and humidity, and all exposure to fumes, odors, dusts, gases or poor ventilation.

The ALJ stated he relied on Dr. Sharp's assessment of January 25, 2005 and June 30, 2005, as well as Dr. Sabio's assessment of May 19, 2005. He also gave greater weight to Dr. Sharp's opinion than to Dr. Sabio's, in finding Plaintiff capable of only a reduced range of sedentary work rather than a reduced range of light work. He specifically attributed the greater weight to the fact that Dr. Sharp was Plaintiff's treating physician. A review of the doctors' assessments along with the ALJ's RFC shows that he did give greater weight to Dr. Sharp's assessment. The RFC is nearly identical to the limitations in Dr. Sharp's assessment.

Plaintiff complains about the ALJ's statement that Dr. Sharp was "a spirited advocate for the claimant's disability" as indicating he accorded him lesser weight, but such is simply not the case. The ALJ

only accorded no weight to Dr. Sharp's opinion that: "There is no unskilled sedentary type work, even if he were able to do a very minimum level with restrictions, any where within an hours drive of his home. I doubt that he is capable of maintaining any type of unskilled, sedentary job." The ALJ believed Dr. Sharp "went too far" when he opined that there was no work for Plaintiff "within an hours drive of his home." Later, Dr. Sharp opined that Plaintiff had the functional ability to do sedentary work with limitations "under the optimal conditions. NOT Pocahontas County." The undersigned agrees that Dr. Sharp went too far in both statements. First, as the ALJ stated: "Unfortunate as it may be, the Social Security Act does not provide that work within a claimant's residual functional capacity be readily available to the claimant within an easy traveling distance for him." Second, and more importantly, although Dr. Sharp may know the area in which Plaintiff lives well, he is not a vocational expert, and is therefore unqualified to opine whether work exists in a certain area that Plaintiff can do.

Here the ALJ called upon a vocational expert to testify as to whether jobs existed in the national and regional economy that a hypothetical individual with certain limitations could perform. Those limitations were very similar to those of Dr. Sharp. The Vocational Expert in turn testified that there would be a significant number of jobs in the region that Plaintiff could perform.

The undersigned therefore finds substantial evidence supports the ALJ's consideration of Dr. Sharp's assessment of Plaintiff's ability to do work-related activities.

### E. Listing 3.02(C)(3)

Plaintiff next argues that the ALJ committed an error of law by substituting his opinion for the unrebutted medical opin-

ions of the State of West Virginia, the United States Department of Labor, the claimant's treating physician and diagnostic blood gas studies, which showed that the claimant's [sic] meets a listing of impairment of 3.02(C)3 Table III–A. Defendant contends the ALJ correctly concluded the evidence of record did not support that Plaintiff's pulmonary impairment met the requirements of Listing 3.02(C)(3).

The undersigned has already found that the ALJ was not required to rely on the findings of disability by the Workers' Compensation and Black Lung agencies. The undersigned has also already found that the ALJ properly evaluated Dr. Sharp's opinion. The sole remaining issue in this regard is therefore the one blood gas study of January 29, 2004. On January 29, 2004, Plaintiff underwent a treadmill stress test. The report notes he was tested at two miles per hour and achieved his target heart rate. Plaintiff tolerated the test well, without complications. Plaintiff's post-test readings were as follows: pH 7.38; $pCO_2$ 36; $pO_2$ 57; $HCO_3$ 20, B.E. – 3.6, and $O_2$ Sat. 89 (R. 100, 529).

During the administrative hearing, Plaintiff's counsel argued that the exercise blood gas study readings met Listing 3.02(C)3 Table III–A. A review of the study does show numbers that appear to meet the listing. The ALJ therefore sent the test results to Dr. Gomez for analysis. Dr. Gomez opined that he was unable to determine from that one test that Plaintiff met the Listing, because the report did not provide for how long Plaintiff exercised. He also opined that no other test results met a listing.

Plaintiff argues:

Pursuant to Listing 3.02(C)(3), there should be a steady state of exercise with a level of exercise equivalent to less than five (5) METS. It is apparent that the main issue is that the level of exercise be minimal not strenuous. The testing performed on my client shows it was done on a treadmill, at two (2) mph and the exercise was stopped due to target heart rate achieved. It is therefore quite reasonable to accept that exercise was done at less than five (5) METS.

The requirements of the listing at issue, and, indeed, for any listing are, however, very strict. Under "Methodology," the Regulations provide:

The individual should then perform exercise under steady state conditions, preferably on a treadmill, breathing room air, for a period of 4 to 6 minutes at a speed and grade providing an oxygen consumption of approximately 17.5 ml/kg/min (5 METS). . . . . If the claimant fails to complete 4 to 6 minutes of steady state exercise, the testing laboratory should comment on the reason and report the actual duration and levels of exercise performed. This comment is necessary to determine if the individuals' test performance was limited by lack of effort or other impairment (e.g., cardiac, peripheral vascular, musculoskeletal, neurological.). . . . The exercise report should contain representative ECG strips taken before, during and after exercise; resting and exercise and grade settings . . . ; and the duration of exercise. . . . The altitude of the test site, its normal range of blood gas values, and the barometric pressure on the test date must be noted.

A review of the record of the documentation of the study shows that, although there was a space for "Type of exercise and duration," it was left blank. The report also appears to have omitted the required barometric pressure and normal range of blood gas values. Because the document omitted several requirements, the undersigned believes the ALJ acted appropriately and properly in sending the report to a medical doctor for his interpre-

tation of the test. That medical doctor responded to the ALJ's inquiry by stating he would be unable to determined if Plaintiff met the listings from the one test, because it omitted any mention of duration of exercise. Further, none of the results of any of Plaintiff's other tests met a listing. Had the ALJ taken it upon himself to decide that the test did not show Plaintiff met a listing, the undersigned might be inclined to agree with Plaintiff. But, here, the ALJ sent the test to a medical doctor, who reported back that it was undeterminable whether Plaintiff met the listing. The undersigned therefore finds that substantial evidence supports the ALJ's interpretation of the test results as well as his finding that Plaintiff did not meet a listing.

## F. Vocational Expert

Plaintiff next argues that the ALJ improperly relied upon vocational expert testimony where the vocational expert testimony recommended jobs that were outside of the claimant's residual functional capacity. Defendant contends the ALJ properly relied upon the testimony of the vocational expert when finding Plaintiff retained the residual functional capacity to perform a significant number of jobs in the national economy.

Plaintiff argues that the ALJ erred in accepting the VE's testimony because "[t]he jobs listed by the vocational expert were clearly outside of the claimant's residual functional capacity." The VE listed the jobs of assembler, surveillance system monitor, and office clerk. All of the jobs were unskilled and at the sedentary exertional level. Plaintiff first argues that the VE testified that some assembly work may cause noise exposure and could contain a moderate amount of dust and fumes. Further, assembly jobs were production jobs which could be stressful. Further, surveillance monitor is listed as a government job and therefore should not meet the burden of proof necessary to prove the claimant

can perform other work. Finally, the job of general office clerk is "certainly outside the claimant's residual functional capacity as he does have a limited education and limited intelligence [and] the consultative expert noted the claimant had moderately impaired judgment [and] mildly impaired concentration."

At the fifth step of the sequential evaluation, "the burden shifts to the [Commissioner] to produce evidence that other jobs exist in the national economy that the claimant can perform given his age, education, and work experience." *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992). The ALJ must consider the claimant's RFC, "age, education, and past work experience to see if [he] can do other work." 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1). In *Koonce v. Apfel*, 1999 WL 7864, 166 F.3d 1209 (4th Cir.1999), the Court held that an ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. *Lee v. Sullivan*, 945 F.2d 687 (4th Cir.1991)(noting that a requirement introduced by claimant's counsel in a question to the VE "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record.")

The ALJ may rely on VE testimony to help determine whether other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1566(e), 416.966(e). The Fourth Circuit has held that "[t]he purpose of bringing in a vocational expert is to assist the ALJ in determining whether there is work available in the national economy which the particular claimant can perform." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989). When "questioning a vocational expert in a social security disability insurance hearing, the ALJ must propound hypothetical questions

to the expert that are based upon a consideration of all relevant evidence of record on the claimant's impairment." *English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir.1993) (*citing Walker v. Bowen,* 876 F.2d 1097, 1100 (4th Cir.1989)).

If the ALJ poses a hypothetical question that accurately reflects all of the claimant's limitations, the VE's response thereto is binding on the Commissioner. *Edwards v. Bowen,* 672 F.Supp. 230, 235 (E.D.N.C. 1987). The reviewing court shall consider whether the hypothetical question "could be viewed as presenting those impairments the claimant alleges." *English v. Shalala,* 10 F.3d 1080, 1085 (4th Cir.1993).

The undersigned finds the ALJ here propounded a hypothetical presenting all the impairments alleged by Plaintiff that were supported by the record, but in particular, alleged by his treating and examining physicians. First, Plaintiff correctly notes that the VE stated that some of the assembler jobs could involve background noise. Dr. Sharp, Plaintiff's treating physician, upon whom the ALJ mostly relied for his hypothetical, opined, however, that Plaintiff had a 1% hearing loss but his exposure to noise and vibration could be unlimited. The undersigned therefore finds the jobs listed by the VE would not be rejected due to background noise.

Regarding Plaintiff's alleged mental limitations, Dr. Joseph found his full scale IQ was in the Borderline Range. However, motor activity was calm; posture was appropriate; eye contact was average; language usage was average; speed of speaking was normal; content was relevant; conduct during the interview was cooperative; no psychomotor disturbances were noted; affect was flat; insight was adequate; immediate memory was normal; recent memory was mildly impaired; and remote memory was normal. Judgment was considered moderately impaired and concentration only mildly impaired. Plain-tiff reported making the bed, dusting, cooking meals, and putting groceries away. He could take out the garbage, walk to the mailbox, drive a car, go grocery shopping, and manage his own finances. He fished a little and liked to play cards. Socialization was considered normal, as was interaction. When questioned about the clerk jobs, the VE testified that these were "basically routine kind of low level jobs. Most of them require less than a sixth grade education. I'm not going to say they all do, but generally they're the routine, the repetitive, the easier kinds of jobs." When asked if Plaintiff would be required to use the computer or phone in these jobs, the VE testified he would not be required to use the computer, but possibly the phone and the copy machine.

There is no evidence that Plaintiff could not handle the simple, routine clerk jobs listed by the VE. Substantial evidence therefore supports the ALJ's reliance on the VE's testimony regarding these jobs of which 86,000 exist in the national economy and 2,400 exist in the regional economy.

Regarding the surveillance system monitor job, the only argument Plaintiff propounded was that at least some of these were government jobs and the VE could not separate the government jobs out from the non-government jobs. The VE did, however, testify: "I might add that for the most part those are considered to be government jobs, but I'm sure that they—I say I'm sure. My best guess would be that they're not and this is probably one of the most under reported jobs that I think we see, every Wal-mart, every K-mart, every bank. . . ." He also testified that even the actual government jobs would not require a high school education, or generally, even a civil service test. The VE's testimony in this regard is supported by other very recent cases, such as *Quesen-berry v. Astrue,* 2007 WL 2965042

(W.D.Va.)(slip copy), in which the VE stated that, "although the DOT listed the job of surveillance system monitor as a government job, that information is not accurate today because many private companies now install surveillance systems." *Id.* at *5.* Additionally, in *Wilcox v. Barnhart,* 2004 WL 1733447 (D.N.H.2004)(not reported in F.Supp.2d), the Chief District Judge disagreed with the claimant's argument that the DOT identified surveillance system monitor as a government service job, stating: "A more close examination, however, reveals that the DOT's industry designation shows 'in what industries the occupation was studied but does not mean that it may not be found in others.' " *Dictionary of Occupational Titles,* XXI (4th ed., rev. Vol I 1991). "Therefore, industry designations are to be regarded as indicative of industrial location, but not necessarily restrictive." *Id.* **

As for counsel's questioning of the VE regarding Plaintiff's ability to reach in all directions, significantly, Plaintiff's own treating physician found his ability to reach in all directions, handle, finger, and feel were all unlimited.

The sole limitation that concerns the undersigned is the ALJ's finding that Plaintiff must avoid all exposure to dust, fumes, and gases, and the VE's testimony that out of the 58,000 national, and 1700 regional assembly jobs, "all would have dust, but there's a moderate amount of dust fumes, odors as we sit now." Counsel inquired: "Would there be more than what would be in the room that we are in today?" Answer: "More than likely yes?" Question: "Can you separate out a number from the numbers that you've given that would eliminate those jobs that would have—" Answer: "I could not do that."

The undersigned therefore finds there is at least a chance that a number of the assembly jobs might be too dusty to comply with Plaintiff's limitations, despite the fact that on a number of occasions Plaintiff has reported to his physicians that he dusted or vacuumed. Nevertheless, even omitting the entire 1,700 regional assembly jobs (58,000 nationally), still leaves the general office clerk jobs (2,400/ 86,000) and surveillance system monitor jobs (500/ 13,000). Notably these remaining jobs exist in substantial numbers in both the national and regional economy.

Significantly, Plaintiff's own treating physician believed Plaintiff could preform a limited range of sedentary work. Despite finding Plaintiff not entirely credible, the ALJ severely limited the work Plaintiff could do, in most part relying on Plaintiff's treating physician for the limitations. The undersigned finds the ALJ posed a hypothetical question that accurately reflected all of the claimant's limitations that were supported by the record, and the VE's response thereto is therefore binding. *Edwards v. Bowen,* 672 F.Supp. 230, 235 (E.D.N.C.1987).

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was not totally disabled from all work as defined in the Social Security Act, at any time prior to his decision.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the

---

* Quesenberry is attached to this Report and Recommendation.■

** Wilcox is attached to this Report and Recommendation/Opinion.■

Plaintiff's application for DIB is supported by substantial evidence. I accordingly recommend the Defendant's Motion for Summary Judgment [Docket Entry 12] be **GRANTED;** Plaintiff's Motion for Judgment on the Pleadings [Docket Entry 9] be **DENIED;** and this matter be dismissed and stricken from the Court's docket.

Any party may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce,* 727 F.2d 91 (4th Cir.1984), *cert. denied,* 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984); *Wright v. Collins,* 766 F.2d 841 (4th Cir.1985); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435(1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record.